**BALTIMORE CONTRACTORS, INC.**

v.

**The UNITED STATES.**

No. 272–70.

United States Court of Claims.

Feb. 25, 1981.

Robert D. Wallick, Washington, D. C., attorney of record, for plaintiff. Henry C. Ikenberry, Roger E. Warin, Stephen A. Fennell, and Steptoe & Johnson, Washington, D. C., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

FRIEDMAN, Chief Judge:

This government contract case is before the court on defendant's exceptions to the recommended decision of Trial Judge Spector. The trial judge held that, because of various defects in the operating methods and procedures of the Board of Contract Appeals that decided the case, the plaintiff is entitled to a trial *de novo* on the issues the Board adjudicated. We hold that the Board proceedings in this case were so defective that the Board's findings and decision are not entitled to the usual finality accorded Board decisions under the Wunderlich Act, 41 U.S.C. §§ 321–22. We conclude, however, that the plaintiff is not entitled to a trial *de novo*, but only to a *de novo* decision, based on the record before the Board, to be made by a different trial judge.

### I.

A. In 1964, the plaintiff entered into a contract with the Architect of the Capitol (Architect) to construct for $11,777,000 two underground garages and related structures as part of the Rayburn House Office Building project. A number of disputes arose during the performance of the contract, and in 1970 the plaintiff filed suit in this court seeking damages for the claims involved in those disputes. The government moved to dismiss because of the plaintiff's failure to exhaust its administrative remedies before the Contract Appeals Board. The court

denied the motion but suspended the case pending completion of the Board proceedings. Those proceedings were concluded in 1975, when the Board denied the last of the plaintiff's claims.

The plaintiff here challenges the decision of the Contract Appeals Board respecting the plaintiff's claims under the "disputes" clause of the contract. It also seeks damages for breach of contract claims that the Board did not decide for lack of jurisdiction. The plaintiff further alleges that the proceedings before the Board were defective in various respects, and it seeks a trial *de novo* on the issues the Board adjudicated.

In 1976, Trial Judge Spector granted the plaintiff's motion for a trial *de novo* to the extent it related to (1) the claimed defects in the Board proceedings and (2) the breach of contract claims not decided by the Board. In an *en banc* order this court upheld those rulings. *Baltimore Contractors v. United States,* 210 Ct.Cl. 678 (1976).

Following the trial on the issue of the propriety of the Board's procedures and practices,[1] the trial judge rendered the decision under review. On the basis of detailed findings and a lengthy opinion, he concluded that the Board proceedings were "defective, inadequate, and (in the case of the breach claims) unavailable," that the Board's decision therefore was not entitled to finality under the Wunderlich Act, and, "as a corollary to that conclusion, that

plaintiff is entitled to a trial [*de novo*] of its claims in this court."

B. The trial judge made a number of detailed findings, many of which we adopt,[2] relating to the deficiencies in the House Board's operations and procedures. To the extent necessary to our decision, we now summarize them.

1. *The Organization and Staffing of the House Board.* The Act authorizing construction of a new House Office Building directed the Architect to manage the project under the supervision of the House Office Building Commission (House Commission) composed of the Speaker and two other House Members. Pub.L. 84–24, 69 Stat. 41, § 1201, 40 U.S.C. § 175 note. The Architect supervised the preparation, negotiation, and execution of the construction contract. He also acted as the contracting officer in administering the contract and entertaining claims under the disputes clause of the contract by the contractor for additional compensation. The contract contained the standard disputes clause under which the contractor could appeal a decision of the contracting officer to the head of the department, which in this case was the House Office Building Commission. The Commission created a Contract Appeals Board (House Board) to act as its "duly authorized representative" under the contract for deciding those appeals.

---

1. The government argues that the determination of the fairness of the House Board proceedings must be based on the record before the Board and that it was improper for the trial judge to decide that issue based upon a *de novo* record. This court's *en banc* order in 1976 affirming the trial judge's decision to conduct *de novo* proceedings on that issue, however, is the law of the case. The defendant has not established that that ruling was so erroneous or manifestly unjust as to warrant reconsidering it. *See Northern Helex Co. v. United States,* 225 Ct.Cl. ——, 634 F.2d 557 (Oct. 22, 1980); *United States v. Turtle Mountain Band of Chippewa Indians,* 222 Ct.Cl. ——, 612 F.2d 517 (1979). In any event, a single panel of this court could not overrule that decision. Finally, the Board took no evidence on the fairness issue, although it was given the opportunity to do so. In 1973, during the Board proceedings and prior to the introduction of evidence on the

largest claims, plaintiff moved to recuse the Board and its chairman. The Board summarily denied this motion.

2. We adopt the following findings of the trial judge but do not print them because, to the extent necessary to our decision, they are contained in our opinion: 1, 2, 3, 4, 5, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 35, 37, 38, 39, 40, 42, 52, 53, 54, 55 (last sentence only), 56, 57, 58, 59, 60, 61, 62, 63, 64, 65 (except for last sentence), 66, 67, 68, 69, 70, 71, 72, 73, 79, 81, 83 (last two sentences only, and deleting words "earlier-mentioned" from last sentence), 84 (except for last sentence), 86, 87, 88, 89, 90, and 91 (except for last sentence). We do not adopt any of the other findings of the trial judge because we consider them unnecessary to our decision.

The House Commission appointed as members of the House Board employees of the General Accounting Office (GAO), to serve part time in that capacity in addition to performing their usual duties at their agency. The original House Board consisted of three GAO employees, two of whom were lawyers in the General Counsel's office. The House Board subsequently was increased to six members, all GAO employees.

In connection with an earlier contract to construct the new Senate Office Building, which contract the Architect also had administered, the Senate Office Building Commission had designated members of the U.S. Army Corps of Engineers Contract Appeals Board to serve as an advisory board to the Senate Commission in deciding appeals from the Architect's decisions under that contract. Another contractor on the House Office Building had protested the use of the GAO lawyers as part-time members of the House Board. According to the testimony of counsel for that contractor, which was disputed but which the trial judge apparently credited, Mr. Winkelmann, the Architect's general counsel, informed counsel for the contractor, Mr. Cuneo, that

the HOBC would not authorize as its representative under the "Disputes" clause either the U.S. Army Corps of Engineers Board of Contract Appeals, or the Armed Services Board of Contract Appeals (ASBCA), because the HOBC wanted the board to be staffed by employees of the legislative branch. Mr. Winkelmann stated to Mr. Cuneo, and the latter so testified, that the Corps of Engineers Board had previously returned advisory decisions unfavorable to the Architect in matters involving the construction of the Senate Office Building, and that "[t]his time, we're going to use our own Board, our own lawyers, * * * the General Accounting Office lawyers." [Fdg. 26.]

Following the filing of the present case, the plaintiff in 1972 asked the House Commission to relinquish jurisdiction over the claims then before the House Board, so that this court could decide all the claims in this case. In response to this request, Mr. Pettibone, a lawyer on the staff of the Architect's General Counsel who was representing the Architect in the plaintiff's appeal to the House Board from the Architect's decisions, submitted a memorandum to the Architect opposing the plaintiff's request.

He stated that to allow such an action would "leave the Government exposed, unprotected and at the mercy of a predatory contractor with trumped-up claims of $5 million." In his response to the HOBC on July 24, 1972 the Architect of the Capitol in turn adopted the foregoing language of his trial attorney and otherwise based his reply on the Pettibone memorandum. [Fdg. 60.]

When plaintiff subsequently renewed with the House Commission its request to consolidate all of its claims into a single trial before this court, the Architect's staff prepared the agenda for the House Commission meeting that considered the request. The agenda described the plaintiff's request "as one to 'circumvent normal procedure' with respect to plaintiff's claims. The Architect admitted at trial that the words chosen did not represent an impartial characterization of plaintiff's petition as carried on the HOBC agenda." (Fdg. 63.) The House Commission denied the request in a letter the Architect and his counsel drafted.

2. *The Relationship Among the GAO, the Architect, and the House Board.* (a) The Architect and his staff had a significant role in selecting the people to serve on the House Board. It was the Architect who initially recommended to the Chairman of the House Commission that the House Board should consist of employees of the GAO. (Fdg. 21.) When the membership of the House Board was changed and its size increased in 1972, the Deputy Comptroller General consulted with the Architect and his General Counsel "concerning the new appointment" of GAO employees to the Board. (Fdg. 29.)

A GAO attorney, Mr. Lynn, served as chairman of the House Board from its cre-

ation in 1963. In 1970, Mr. Lynn announced that he would retire from the GAO that summer. "A witness for plaintiff testified that when Mr. Lynn announced his retirement, the Architect's trial attorney, Mr. Pettibone, publicly indicated he was 'working hard on (Mr. Lynn's) appointment to be Chairman of the Board.'" (Fdg. 31.) Mr. Lynn continued to work at GAO as a reemployed annuitant and remained as chairman of the House Board.

(b) The Architect and his staff sought and received advice from the GAO staff in connection with various problems that arose under the contract. "On occasion, the participating GAO attorney in these claims conferences would be the supervisor of a part-time board member charged with hearing and determining plaintiff's claims." (Fdg. 24.) One of the House Board members was Mr. Ruppert; one of his superiors at GAO was Mr. Goldstein, who "participated in conferences with the Architect's staff" on some of the disputes under the contract. (Fdg. 32.) Another House Board member, Mr. Cosden, was supervised at GAO by Mr. Shnitzer, a former member of the House Board. During his service on the House Board, Mr. Shnitzer "recognized the possibility that his position as a member of the board could conflict with his regular full-time duties as a member of one of the contract groups at GAO. He expressed his concern in a letter to his section chief, Mr. Haycock. He suggested therein that a matter then pending before the GAO be assigned to someone else. This concern was later the subject of memoranda between Mr. Haycock and Mr. Welch in the General Counsel's office, in which the possibility of excluding Mr. Shnitzer from Mr. Haycock's contract group was discussed with reference to a particular controversy." (Fdg. 24.)

3. *The Sharing of Office Space by the Architect's Counsel and the House Board.* The trial counsel for the Architect, Mr. Pettibone, and the House Board shared office space in the Rayburn House Office Building. The space consisted of three private offices and a reception area which the House Board also used as the hearing room.

The House Board used one of the private offices, and Mr. Pettibone used the other two. The secretaries for the House Board and for the Architect's trial attorney occupied adjacent desks in the reception area. When one secretary was absent, the other would fill in for her. According to the chairman of the House Board,

when the board's secretary was absent, Mr. Pettibone's secretary would docket appeals for the board, prepare the appropriate files, act as the board's receptionist, and type letters for the board. The secretary of the board assisted Mr. Haas, an assistant trial attorney, in the preparation of a brief to be submitted to the board. [Fdg. 72.]

4. *Ex Parte Contacts Between the Architect's Staff and the House Board.* Both the files of the House Board and the personal files of the Board's Chairman contained a number of internal documents from the Architect's office. These are described in findings 88 and 89. They include a memorandum from the Architect's assistant trial attorney concerning one of the plaintiff's claims (House Board files), a memorandum from the Architect's trial counsel to the Architect's General Counsel concerning a discussion between the former and the Justice Department about plaintiff's appeal from an order of the trial judge (House Board files), and memoranda from the Architect to the Speaker and from the trial counsel to the Architect's General Counsel concerning the petition the plaintiff filed with the House Commission requesting consolidation of all the claims in this court (chairman's files). (*See supra* pp. 4–5.) The chairman of the House Board testified that he had received certain of the documents generated in the Architect's office that were found in his personal file from the Architect's trial attorney, Mr. Pettibone.

II.

A. Here, as in *Moore-McCormack Lines, Inc. v. United States*, 188 Ct.Cl. 644, 675, 413 F.2d 568, 587 (1969), we conclude that

"the Board's procedures have been so defective as to constitute a gross abuse of discretion and thus to invalidate its determinations." The trial judge's findings summarized above show that the operating methods and procedures of the House Board were so defective that its decisions cannot stand.

The Board's operations and procedures departed from accepted standards of fair procedure in numerous respects. These included the significant role the Architect and his staff had in selecting the members of the House Board that would decide appeals from the Architect's decisions; the conflicts of interest inherent in the dual role the Board members had as employees of the GAO (the agency that advised the Architect on many issues that arose under the contract) and as the tribunal that reviewed the Architect's decisions; the sharing of office space and personnel by the Architect's trial counsel and the House Board, and the interchange of secretarial personnel between them; and the ex parte contacts between the Architect's staff and the House Board reflected in the presence in the files of the Board and its chairman of internal documents of the Architect and his staff. Perhaps none of these facts alone would invalidate the House Board's proceedings. In their totality, however, they constitute a denial of the "procedural fairness [that] is the right of every government contractor," which is "the clear assumption of the Wunderlich Act." *Moore-McCormack Lines, supra,* 188 Ct.Cl. at 671, 413 F.2d at 584.

Indeed, members of the House Commission themselves expressed concern about the fairness of the House Board. At a 1969 meeting of the House Commission

> its chairman, Speaker McCormack, stated that he was never satisfied with the composition of the board because it consisted of Government employees who, no matter how impartial they attempted to be, nevertheless could not avoid some conflict of interest. Congressman Celler agreed with Speaker McCormack that the board might have "mental reservations which would prejudice a case in favor of the Government." [Fdg. 56.]

Congressman Celler had expressed similar reservations at a meeting of the Commission 5 months earlier. (Fdg. 54.)

The concept that government contractors are entitled to procedural fairness before a Contract Appeals Board is inherent and implicit in the statutory scheme under the Wunderlich Act for judicial review of Board decisions. The Wunderlich Act makes the decision of a Board of Contract Appeals "final and conclusive unless," among other things, it "is not supported by substantial evidence." 41 U.S.C. § 321. A necessary corollary of that conclusion is that the decision of the Board that is given such finality must have been reached through procedures that are fair to the parties. *Cf. Moore-McCormack Lines, supra,* where we stated that "[e]specially if the merits of the determination may be largely shielded from judicial review"—as is the situation under the Wunderlich Act—"is it essential that proper procedures precede the administrative decision. In those situations the right to fair process may be the most meaningful right possessed by the affected parties, and at the same time the sharpest goad pressing the decision-maker toward a fair and correct result." 188 Ct.Cl. at 665, 413 F.2d at 581.

Of course, there is no way of knowing whether the relationship among the Architect and his staff, the GAO, and the House Board influenced the Board in its decision. It is possible that if the House Commission had utilized an independent full-time board, such as the Corps of Engineers Board the Senate Office Building Commission had used (*see supra* p. 4), the result of the House Board proceedings in the present case would have been the same. On the other hand, it is equally possible that the relationship among the government interests involved in this case subtly or even unconsciously may have influenced to some degree the outcome of the case. Since it is impermissible for the court to probe the decisional and thought processes of the Board and its members, *see United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941), *Montrose Chemi-*

cal Corp. v. Train, 491 F.2d 63, 67–71 (D.C. Cir.1974), care must be taken to avoid any situations that possess a significant danger of improper influence. Indeed, even where there is no claim of actual bias, a tribunal may be disqualified merely because of the appearance of bias. Cf. Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968); Jonal Corp. v. District of Columbia, 533 F.2d 1192, 1201–04 (D.C. Cir.), cert. denied, 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976) (Leventhal, J., dissenting in part).

In the present case, the relationship among the Architect and his staff and the House Board and its members created not only an appearance of unfairness but also the serious possibility that improper influence actually may have been at work and affected the outcome. In these circumstances the decisions of the Board cannot stand.

B.1. The next question is whether in such circumstances the limitations that the Wunderlich Act imposes upon the scope of our review of Board of Contract Appeals decisions are inoperative, so that we may decide the substantive questions de novo instead of reviewing the Board's decision under the substantial evidence test. The pertinent provision of the Wunderlich Act provides that the decision of a Board of Contract Appeals "shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321. A broad decision that is reached through unfair procedures is "capricious or arbitrary" within the meaning of this provision. Although the capriciousness-or-arbitrariness standard may relate primarily to the substance of the Board's decision, it is broad enough also to cover the serious procedural defects that characterized the administrative proceedings in this case. Cf. Moore-McCormack Lines, supra, 188 Ct.Cl. at 667, 413 F.2d at 582, where we pointed out that "by long tradition" "abuse of discretion" or "gross abuse of discretion" "include review for failure to maintain minimal procedural requirements."

In United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), the Supreme Court held that when this court reversed a Board of Contract Appeals dismissal of an appeal as untimely, the proper procedure for this court was to remand the case to the Board rather than to develop the record and to determine the merits itself. In so ruling, however, the Court recognized that "the parties will not be required to exhaust the administrative proceedings if it is shown by clear evidence that such procedure is 'inadequate or unavailable.'" 384 U.S. at 429–30, 86 S.Ct. at 1542–43. The Court then gave two examples of situtions where the administrative procedure would be deemed unavailable but no instances where it would be inadequate.

In the present case the defect we have found in the House Board proceedings made that administrative procedure "inadequate." The same reasoning that led the Supreme Court to except from the requirement of exhausting administrative remedies cases where the administrative proceeding is inadequate also justifies an exception for such cases from the Wunderlich Act's rule of finality. In either situation, the deficiencies in the Board's practice make it inappropriate to apply the usual rules governing judicial review of Board decisions.

2. In most cases where we determine that in the Board proceedings the contractor was denied the "procedural fairness" that the Wunderlich Act requires (Moore-McCormack Lines, supra, 188 Ct.Cl. at 671, 413 F.2d at 584), the flaw can be corrected by a remand to the Board to reconsider the case under proper procedures. That was the course we followed in Moore-McCormack Lines itself, where the procedural error was the failure of the Maritime Subsidy Board to give the plaintiffs information they needed to present their cases. We concluded that there was no reason to believe that the Board would "fail to give the owners a full, good faith redetermination of the proper subsidy for these ships upon new

and fair proceedings, or that it is now so prejudiced that the protections of a trial-type hearing are required." 188 Ct.Cl. at 680, 413 F.2d at 590.

In *Moore-McCormack Lines* the procedural unfairness was something the agency easily could correct upon remand by giving the contractors the information it had denied them in the initial proceedings. In the present case, in contrast, the procedural flaw stemmed from the basic way in which the Board was established and operated. There is no way in which upon a remand the House Board as it presently exists could cure the deficiencies that we have determined require that its decisions be set aside. Only a *de novo* review in this court adequately can protect and preserve the plaintiff's right to have its claims adjudicated by a fair and impartial tribunal. Indeed, the clear implication of our explanation in *Moore-McCormack Lines* of why we were remanding that case to the Board rather than deciding it ourselves *de novo* is that we could and would hear it *de novo* if remand to the agency appeared inadequate to correct the procedural errors found. *See* 188 Ct.Cl. at 676–80, 413 F.2d at 587–90.

C. We disagree with the trial judge's conclusion that the plaintiff is entitled to a trial *de novo* of the issues under the disputes clause that the House Board determined. The plaintiff concedes that the House Board made a full record on these issues and did not exclude any pertinent evidence the plaintiff offered. Accordingly, there is no reason for the case to be retried. On remand the trial judge should determine these issues under the disputes clause *de novo* on the basis of the administrative record before the Board.

With respect to the issues the Board did not determine—the breach of contract claims—the trial judge should.hold whatever trial may be necessary. To the extent that evidence was properly admitted before the Board that bears on the breach claim, the trial judge need not duplicate the Board proceedings, but should incorporate that evidence as part of the record before him.

D. At oral argument the defendant suggested that, if we were to rule that a *de novo* trial or review is required, it should be before a different trial judge who would not have the strong views concerning the unfairness of the House Board's proceedings that Trial Judge Spector's opinion reflects. The government apparently is concerned that Trial Judge Spector's views on that issue might color his thinking on the merits and that the further proceedings in this case should be conducted in an atmosphere that would be totally free of any possible claim of bias or unfairness. Presumably one aspect of the government's concern is the appearance of unfairness. Although the plaintiff indicated that it would be satisfied if Trial Judge Spector continued with the case, it further indicated that it would not object if the case were referred to another trial judge.

We have no doubt that Trial Judge Spector would be impartial and fair in deciding the merits. We conclude, however, that considering all the circumstances of this case, the proceedings on remand should be conducted by another trial judge.

## CONCLUSION

The decisions of the House Contract Appeals Board are set aside. The case is remanded to the Trial Division for further proceedings in accordance with this opinion, to be conducted by another trial judge.

KUNZIG, Judge, specially concurring:

While I am in general agreement with the Chief Judge's disposition of this cause—including the remand to a new trial judge—I must object to the ultimate legal authority relied upon in his opinion.

I find no basis for the conclusion that the Wunderlich Act authorizes procedural review of Board decisions. In a related context, the Supreme Court has forcefully held that the "arbitrary or capricious", "substantial evidence", "abuse of discretion" and other familiar standards do *not* give reviewing courts a roving commission to engage in procedural review of administrative actions. *Vermont Yankee Nuclear Power Corp. v.*

*Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

The proper foundation for our decision is the due process clause of the fifth amendment. *See, e. g., Jonal Corp. v. District of Columbia,* 533 F.2d 1192 (D.C.Cir.), *cert. denied,* 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976). It is well settled that a core element of due process is the assurance of an impartial decisionmaker. *See Ward v. Monroeville,* 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972); *Coolidge v. New Hampshire,* 403 U.S. 443, 449, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Tumey v. Ohio,* 273 U.S. 510, 523, 532, 47 S.Ct. 437, 441, 444, 71 L.Ed. 749 (1927); *Overlook Nursing Home, Inc. v. United States,* 214 Ct.Cl. 60, 66, 556 F.2d 500, 502 (1977). "Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clean and true" between the State and its opponent "denies the latter due process of law". *Tumey v. Ohio,* 273 U.S. at 532, 47 S.Ct. at 444.

In my view, the procedural facts of this case indicate a sharp and unpardonable departure from this principle.*

BENNETT, Judge, dissenting:

The court today has announced a sweeping expansion of its scope of review in government contract cases. Ignoring the clearly posted signs of caution erected by the Congress and the Supreme Court which warn the Court of Claims that its jurisdiction to review these cases is bounded by the terms of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976), this court once again wanders beyond those limits into the quicksands of legal error. This time it concludes that on the basis of what it perceives to be either lack of due process or procedural error by the appearance of unfairness and arbitrary action by the United States House of Representatives in administering one of its contracts, the court has inherent authority to pass on the quality and membership of contract appeals boards and, incidentally, what kind of office space they should occupy and who they should employ for secretarial assistance. This is indeed a large loophole which if allowed to stand will give the court opportunity to shoot down the decisions of contract appeals boards, without ever having considered them, by the device of saying that the board procedures and membership do not meet the unannounced standards of the court for fair play. The court has rejected the board's decisions in this case without seeing them and has ordered that new decisions be rendered by a trial judge of the court following his *de novo* review of the administrative record considered by the board. I judge that our scope of review is limited to the decisions of the boards.[1] A poorly consti-

---

* I must take specific exception to the dissent's grossly inaccurate statement that, "The court today has announced a sweeping expansion of its scope of review in government contract cases." *See infra.* In actuality, the Chief Judge writes only for himself in his viewpoint that the Wunderlich Act authorizes procedural review. My special concurrence has prevented the coalescence of a holding on this point. This leaves the due process rationale upon which I rely. It cannot credibly be argued that its applicability in the present context is either surprising or novel.

1. 41 U.S.C. §§ 321, 322 (1976), the Wunderlich Act, states:

"§ 321. Limitation on pleading contract provisions relating to finality; standards of review

"No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

"§ 322. Contract provisions making decisions final on questions of law

"No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

tuted board with slipshod procedures may still make the right decision that does not conflict with Wunderlich Act standards which state that the "decision shall be final and conclusive unless the same is fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." There is no judicial precedent or statutory authority for what the court has done in this case. I respectfully dissent.

When this case was first before the trial judge on appeal from the contract appeals board of the House Office Building Commission (HOBC), he entered an order on March 3, 1976, which denied defendant's attempts to limit review of the issue of adequacy of the administrative remedy to the administrative record. On May 28, 1976, the court affirmed his order and permitted him to proceed to trial on the inadequacy issue. *Baltimore Contractors, Inc. v. United States*, 210 Ct.Cl. 678 (1976). In his report filed September 18, 1979, the trial judge concluded that the administrative remedy "was defective and inadequate and a *de novo* trial is required on all these contract claims." Defendant has appealed that ruling. Plaintiff does not except to it. That is the ruling now in issue. However, there has been a shift in plaintiff's position and it no longer seeks a *de novo* trial. Instead, plaintiff seeks only a *de novo* review of the administrative record and that is what the court has allowed. Clearly, the decision in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), and two other decisions which followed from the Supreme Court in 1966, make it clear that when a government contract contains a disputes clause prescribing the procedures to be followed in adjudicating claims arising under the contract the court cannot conduct a *de novo* trial when the case comes for review of a board decision. We must accord that decision finality unless it does not meet the tests of the

Wunderlich Act, quoted in note 1, *supra*, *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *United States v. Anthony Grace & Sons*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). That is especially appropriate in the case before us because plaintiff concedes that it was not barred by the board from offering whatever evidence it wished the board to consider. The court does not offer plaintiff a *de novo* trial but contents itself with ordering a *de novo* review of the administrative record considered by the board in making its decision. I consider that to be equally offensive to the Wunderlich Act and ‸the Supreme Court's precedents, and our own precedents, for reasons which are easily demonstrated.

At the outset, it must be emphasized what is not before us for decision. The court's delaying order issued in 1976, permitting the trial judge to proceed to test the fairness or adequacy of the board's procedures by a *de novo* review thereof without reference to the board's decision, is not being tested now. Nor has the court accepted his recommendation. He concluded that the procedures were sufficiently deficient to constitute a breach of the contract. The court agrees with his characterization of the procedures but does not rest its decision on a theory of breach. Rather, the opinion of the Chief Judge says that these perceived deficiencies violate an implied provision of the Wunderlich Act for procedural fairness in deciding contract cases. It is important to see what those alleged deficiencies are and then to examine what precedent is advanced to support the decision with respect thereto. The court sees and states four major faults in the board's operations and procedures and adopts the trial judge's findings with respect to them.

First, the court says that the organization and staffing of the HOBC Contract Appeals Board is suspect because the contracting officer, the Architect of the Capitol, insisted

---

The footnote to the concurring opinion dramatizes a total lack of appreciation that the result it achieves is novel and sweeping, by whatever justification it advances, because, instead of reviewing the board decisions for finality under Wunderlich Act standards and as the disputes clause of the contract provides, it orders a *de novo* decision by the court with no announced, definable standards and in disregard of the contract.

on a board staffed by legislative branch employees, *i. e.*, from the General Accounting Office. Further, the Architect and his lawyer, in rejecting plaintiff's suggestion that the HOBC relinquish jurisdiction over the claims to this court for decision, stated that—

> * * * to allow such an action would "leave the Government exposed, unprotected and at the mercy of a predatory contractor with trumped-up claims of $5 million." * * * [Trial judge's finding No. 60.]

This absurd statement may have touched a sensitive nerve. But, it can and should be dismissed as a biased characterization by uninformed partisans in the case who thought that they could "stack the jury." It is more of an in-house insult to the professionalism of the lawyers at the General Accounting Office, who served as the HOBC Contract Appeals Board, than it is to the court.

This brings us to the court's second complaint: that the Architect and his staff had influence in the selection of the people to serve on the House board. This must be conceded. It does not follow that this influence corrupted the board, and further discussion of this point will follow.

Third, the court places great importance on the fact that trial counsel for the Architect and the House board shared office space in the Rayburn House Office Building, three private offices, and a reception room which was also used for hearings. The House board used one of the private offices and the Architect's lawyer used the other two. The two secretaries, one for the board and the other for the Architect's lawyer, had their desks in the reception area. When one secretary was absent, the other would fill in for her.

Fourth, it is a fact that the files of the House board and the files of the board's chairman contained some internal documents from the Architect's office and certain other correspondence referred to in more detail hereafter.

In further response to the foregoing expression of the court's concerns, I submit a few observations. As to the first two complaints that the contracting officer influenced the selection of contract appeals board members and insisted that they come from the legislative branch itself and that this is impermissible, it must be observed that board members are routinely selected from and paid by the agencies or branch they serve. There is thus no merit to this objection. If we were to go one step beyond the facts of this case and assume for a moment that the same GAO personnel who advised the Architect later sat on the board which heard appeals from his decisions, it would still not necessarily be unfair or deny due process. In fact, only during the last court term we recognized that the combination of investigative and adjudicatory functions generally does not deny due process in administrative agency determinations. *Hudelson v. United States*, Ct.Cl., 618 F.2d 125 (1979), which cites *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), and *Federal Trade Comm'n v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). *See also Gosman v. United States*, 215 Ct.Cl. 617, 622, 573 F.2d 31, 34 (1978); *Overlook Nursing Home, Inc. v. United States*, 214 Ct.Cl. 60, 68, 556 F.2d 500, 503–04 (1977); and *Duke v. North Texas State University*, 469 F.2d 829, 834 (5th Cir., 1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973), *quoted in* K. Davis, Administrative Law in the Seventies § 12.01 (1976).

Returning to the facts of this case, it is certainly arguable whether a different standard should be applied to quasijudicial contract appeals board hearings on government contract claims than to normal administrative hearings. For example, Congress is exempted from the provisions for judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(b)(1)(A) (1976). The APA's procedural requirements for agency adjudications are also inapplicable since government contract appeals board hearings are required by contract and regulation rather than statute. 5 U.S.C. § 554 (Supp. III 1979). This indicates possibly that a different, lesser standard applies.

Further, in this case the appeals board was set up a year before this contract was entered into. Plaintiff thus consented to this "form of arbitration" by the Government by entering into the contract. The question therefore is: did the board lack impartiality and independence to such an extent that the contractor's consent should not bind it to the administrative remedy? On the law and the facts of this case, the contractor should be bound. No procedural unfairness has been shown to have impacted on the board's unreviewed decisions.

As to the sharing of office space and occasional secretarial assistance by the board and the Architect's legal staff, this does have the appearance of impropriety and may have led to a mix-up of some files. This alone, however, is insufficient to rebut the presumptions of regularity and good faith on the part of government employees in the conduct of their duties. It should be sufficient in this case to observe that none of the evidence which plaintiff has produced demonstrates conduct that would inevitably prejudice plaintiff's claims or was certain to affect the board's fair consideration of the merits of its claims.

Finally, there is the matter of *ex parte* communications. This is a valid ground for concern. There was one substantive memorandum by an assistant to the Architect's attorney that dealt with plaintiff's intrusion grouting claim which was granted, in part, by the board on March 31, 1972. The memorandum is basically a digest of cases involving an overrun or underrun in work based on a government (or contractor's) estimate of the amount of work to be done. Assuming that plaintiff has otherwise preserved its grouting claim for review, the trial judge should carefully scrutinize the board's consideration of this claim and provide such relief as he finds justified under all of the facts and circumstances. It may be that the cases cited in the memorandum were argued in briefs to the board and therefore there was no prejudice to plaintiff. However, if the memorandum made arguments to the board to which the plaintiff was unable to respond (because of the *ex parte* nature of the communication), then this conduct may have been a fraud upon plaintiff and plaintiff would be entitled to a *de novo* review of this claim.[2] Since the plaintiff found the memorandum in the board's file, the burden is on the defendant to establish when and how it got there. I reject the defendant's argument that any ambiguity regarding those circumstances detracts from the significance of the memorandum's presence.

Other material found in the board's files and objected to by plaintiff included newspaper accounts of a criminal investigation of plaintiff, documents relating to plaintiff's attempt to take its appeal directly to this court, summaries of the board's docket prepared by the Architect's attorney, communications between the Architect's lawyers, and communications between them and the Architect, the Department of Justice, the HOBC, and the Speaker of the House. None of these *ex parte* materials appear to be of a type which was at all likely to affect the substantive consideration of the plaintiff's claims. I would, therefore, hold that these circumstances, which defendant concedes and I agree are regrettable, are insufficient grounds to set aside the board's decisions on plaintiff's claims.

Plaintiff objects, further, to the fact that Mr. Pettibone, the Architect's trial attorney, actively campaigned to have Mr. Lynn continue as chairman of the HOBC Contract Appeals Board. While such activity is certainly to be deplored when it occurs during the time that the attorney is appearing before the board, Mr. Pettibone's activities do not compel this court to conclude necessarily that Mr. Lynn or the board decided plaintiff's claims adversely in order to repay Mr. Pettibone for his support. The same is true respecting other *ex parte* conversations allegedly held between the Ar-

---

2. Compare the dissent in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 719, 83 S.Ct. 1409, 1415, 10 L.Ed.2d 652 (1963).

chitect's counsel and board members. We do not know the subject of those conversations, and have no reason to believe that these government agents were not acting in good faith.

There are certain other issues raised by plaintiff which are not alluded to by the court but which will certainly be before the trial judge on *de novo* review. I therefore will now address them.

Dr. Osterberg, an expert witness employed by defendant, testified at the hearing from handwritten notes which were in Mr. Pettibone's handwriting. Apparently, these notes were prepared by Mr. Pettibone when he went over the witness' testimony with him prior to the hearing. By not objecting at the time the testimony was given, plaintiff has failed to preserve this objection as a basis for appeal. In any event, even under the more formal Federal Rules of Evidence, Rule 612, the witness could, in the discretion of the hearing official, have used the Pettibone notes to refresh his memory while testifying.

Plaintiff complains that the Architect accepted without changes Mr. Pettibone's draft of a decision for the contracting officer on plaintiff's claim. Such reliance by a supervisor on the work of his staff is not objectionable where there is no indication that the contracting officer did not agree with the draft opinion. Plaintiff has received the independent decision of the contracting officer to which he was entitled.

The trial judge refers to congressional pressure by some Members of the House of Representatives who indicated to the Architect a desire to keep plaintiff from recovering. However, there is no indication that any pressure was exerted upon members of the contract appeals board which considered the Architect's denial of plaintiff's claims. The trial judge also refers to the fact that plaintiff was not allowed to participate in the amendment of the board's rules or in the hiring of an independent consultant by the board. However, there is no basis in the papers before the court upon which we can conclude that the plaintiff was entitled to participate in either of these matters.

I certainly do not condone much of the conduct elaborated in the plaintiff's objections and the trial judge's findings and opinion. However, while the House Office Building Commission may have been insensitive to common proprieties in setting up the board pursuant to recommendations of the contracting officer, and the board itself may likewise not have acted prudently in some particulars, there is no real indication that the board's decisions on the plaintiff's claims were affected thereby or failed the tests of procedural fairness or due process. Having exhausted the administrative remedy, plaintiff must establish that the board's actual disposition of its claims on the merits contravenes the Wunderlich Act guidelines so that it can be set aside or modified because it is "fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."

We must consider now whether the foregoing has justified the court in concluding that plaintiff is entitled to a *de novo* review and decision on the administrative record without any reference to Wunderlich Act guidelines. The court has no relevant authority for its holding. Primarily, the Chief Judge's opinion rests on this court's decision in *Moore-McCormack Lines, Inc. v. United States*, 188 Ct.Cl. 644, 413 F.2d 568 (1969).

In *Moore-McCormack* plaintiffs sought review of the procedures leading to a Maritime subsidy board decision. Those procedures had denied plaintiffs' access to necessary data in the Government's possession. Plaintiffs were also denied a hearing or other reasonable participatory procedure and were not given a statement of the reasons for disallowing the claims. Since there was no disputes clause in this contract and the Wunderlich Act thus did not directly apply, the court found jurisdiction to accord judicial review by the terms of the Administrative Procedure Act, 5 U.S.C. § 1009 (1964), recodified, 5 U.S.C. §§ 701–706 (1976). As to the Wunderlich Act, the court said:

* * * We do not decide at this time whether or not there is an implicit "final-

ity clause" in these contracts, so that the Wunderlich Act applies in full force. * *

*   *   *   *   *   *

* * * here, there is a serious issue (which we leave open) whether the Subsidy Board's determination is entitled to the weight given "disputes" clause findings. [188 Ct.Cl. at 677–79, 413 F.2d at 588–89.]

In *Moore-McCormack* the court also made this statement:

* *·* [It] is the clear assumption of the Wunderlich Act that procedural fairness is the right of every government contractor * * * [188 Ct.Cl. at 671, 413 F.2d at 584.]

On this latter dicta about that Act the Chief Judge's opinion in the present case reasons that *Moore-McCormack* is authority for not applying the Wunderlich Act in situations where the court conceives there was a lack of procedural fairness. This is a bootstrap argument since *Moore-McCormack* turned on other authority. The court there said, in the same paragraph from which the above language is quoted:

First, it is very plain that under plaintiffs' contracts and the Merchant Marine Act they were entitled to fair procedural treatment. * * *

A further distinction between the present case and *Moore-McCormack* is that here the court is not reviewing a board decision as it did in *Moore-McCormack*. Here, also, plaintiff was not denied a hearing or reasoned decision. In fact, plaintiff concedes that it was able to offer into evidence all it wished to submit to the House board. In *Moore-McCormack* the court, further, took care to point out that it did not decide whether *de novo* consideration would be permissible by the court after the Maritime subsidy board made another and proper decision, as it was instructed by the court to do on remand. I note, also, that it did not trouble the court in that case that the subsidy board was an agency board comprised of agency employees and that the remand was to the board and not to the court's trial division.

It is thus evident that the contracts, the facts, the statutes, and the holdings in the two cases are quite different. If *Moore-McCormack* is to be used as a precedent here, it can only be because the Chief Judge's opinion has raised the scientific principle of osmosis to legal doctrine.

The opinion seems to recognize that it treads on very thin ice because in addressing its complaints about procedures here it says:

* * * Perhaps none of these facts alone would invalidate the House Board's proceedings. In their totality, however, they constitute a denial of "the procedural fairness [that] is the right of every government contractor," which is "the clear assumption of the Wunderlich Act." *Moore-McCormack Lines, supra,* 188 Ct.Cl. at 671, 413 F.2d at 584.

What the opinion fails to recognize is that procedural fairness in contract cases with disputes clauses is defined and circumscribed by the Wunderlich Act's explicit terms. Where fairness fails, it will be flushed out by applying the terms of that Act to the board decision, as Congress intended in these cases. Fairness is not to be determined by putting the cart before the horse and passing on the propriety of the procedure before reviewing the decision to see how, if at all, the procedure may have impacted upon it. To approach the case as the opinion does here is to jump the gun and to ignore the language of the Act. The Chief Judge is only able to argue as follows:

In the present case, the relationship among the Architect and his staff and the House Board and its members created not only an appearance of unfairness but also the serious possibility that improper influence actually may have been at work and affected the outcome. In these circumstances the decisions of the Board cannot stand.

So, there we have it. Unlike in *Moore-McCormack* where there was a clear, egregious denial of due process, now we find such a denial in "appearances and possibilities." As authority for this the opinion

cites the *dissent* in *Jonal Corp. v. District of Columbia*, 533 F.2d 1192 (D.C.Cir.) *cert. denied*, 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976). So, we need not dwell on that. Also cited is *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), which was not an interpretation of the Wunderlich Act, but an unexceptional application of the Arbitration Act of 1925 which authorizes vacation of an award "procured by * * * undue means" or "where there was evident partiality * * * in the arbitrators." In that case the business relationship of one of the arbitrators with the prevailing party was not revealed until after the award was made. We do not have that circumstance in the present case. When plaintiff made its contract in 1964, it subjected itself by the terms thereof to the jurisdiction of the HOBC Contract Appeals Board established in 1963. That this board was composed of legislative branch employees was no secret.

The Chief Judge advances one final argument to explain what he deftly describes as making "inoperable" the limitations the Wunderlich Act imposes on our scope of review of board decisions in contract cases. He points to the Act's terms which say board decisions are not final if "arbitrary, or capricious, or so grossly erroneous as necessarily to imply bad faith." He stretches these terms "to include review for failure to maintain minimal procedural requirements." Congress might have written the law in this way, but it didn't. The opinion says this bit of judicial legislating is permissible, however, because in *United States v. Anthony Grace & Sons*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), the Supreme Court held that the parties will

not be required to exhaust administrative remedies if they are "inadequate or unavailable." The Supreme Court in that case narrowly defined those two terms as the unwillingness of a board to act and to follow the procedures outlined in the contract or where there is a lack of authority to act.[3] The Supreme Court did not provide any basis for vitiating an administrative decision which has in fact been rendered and then readjudicating the claim by a *de novo* proceeding in this court. The opinion recognizes that the *Grace* case does not support it directly, but says that the same reasoning justifies an extension of that ruling to include whatever the Court of Claims perceives to be "procedural unfairness." It is submitted that this reasoning completely circumvents the legislative intent behind the Wunderlich Act. By this reasoning a contractor dissatisfied with a board, or who knows he has a weak case unlikely to obtain a favorable board decision, can attack the composition of the board as one constituted with agency employees, and if sufficient suspicions are aroused in court can bypass the terms of his contract's disputes clause. That is what has been accomplished here by Baltimore Contractors, Inc. It is a precedent likely to haunt the court and to find no favor with boards, the Congress, the Executive Department, or the Supreme Court.

Having shown that the Chief Judge's opinion has no support in statute or judicial precedent, I wish next to pay my respects to the brief concurring opinion which agrees with me that the Wunderlich Act does not authorize procedural review of contract appeals boards, independent of review of their decisions, nor can such author-

---

**3.** In that case it was stated:

"* * * the parties will not be required to exhaust the administrative procedure if it is shown by clear evidence that such procedure is 'inadequate or unavailable.' [Citations omitted.] It may be that the contracting officer [citation omitted] or the Board of Contract Appeals [citation omitted] so clearly reveals an unwillingness to act and to comply with the administrative procedures in the contract that the contractor or supplier is justified in concluding that those procedures have thereby become 'unavailable.' Similar-

ly, there may be occasions when the lack of authority of either the contracting officer or the administrative appeals board is so apparent that the contractor or supplier may justifiably conclude that further administrative relief is 'unavailable.' [Footnote omitted.] But these circumstances are clearly the exceptions rather than the rule and the inadequacy or unavailability of administrative relief must clearly appear before a party is permitted to circumvent his own contractual agreement." [384 U.S. at 429 30, 86 S.Ct. at 1542–43.]

ity be implied from that Act or its legislative history.[4] The concurring opinion agrees with the Chief Judge's call for a *de novo* review by a trial judge but places its result on due process grounds. The Chief Judge does not even mention due process. His opinion speaks only of "the appearance of unfairness" and "the serious possibility that improper influence actually may have been at work and affected the outcome," in violation of a provision about procedure written into the Wunderlich Act by judicial implication. To the extent, however, that the claim of lack of due process is involved in this case by the concurring opinion, the authorities cited by that opinion do not support it. First, however, I address the proper position of the concurring opinion that the Wunderlich Act cannot be judicially amended to include judicial review of board procedures without review of the board decision. Aside from the remand to the trial judge, this is the only disputed legal issue on which two of the three members of this panel agree. The remand, therefore, is not supported by any majority legal reasoning.

The important precedent, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), is advanced by the concurring opinion to show that reviewing courts do not have roving commissions to engage in procedural review of administrative actions. That case was decided under the Administrative Procedure Act but is instructive here because of the reliance by the Chief Judge's opinion on *Moore-McCormack*, which likewise was decided under that Act. *Vermont Yankee* is instructive because of language there which cautions that, even apart from the APA, the formulation of procedures should basically be left within the discretion of the agencies to which Congress has confided the responsibility of substantive judgments. The Supreme Court cautions reviewing courts against engrafting their own notions

of proper procedures upon agencies entrusted with substantive functions by Congress. It instructed that a court should "not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." 435 U.S. at 549, 98 S.Ct. at 1214. The Supreme Court said that administrative decisions should be set aside in every context "only for substantial procedural or substantive reasons as mandated by statute, *Consolo v. FMC*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), not simply because the court is unhappy with the result reached." 435 U.S. at 558.

In *Vermont Yankee* the appellate court had held that proceedings of the Atomic Energy Commission's Licensing Appeals Board, although employing APA procedures, were nevertheless inadequate. The Supreme Court said that this conclusion was a serious misreading and misapplication of statutory and decisional law. The same is doubly true here where the APA, by explicit exception, is not even applicable to contracts made by the Congress, such as the one here between Baltimore Contractors, Inc., and the United States House of Representatives. 5 U.S.C. § 701(b)(1)(A) (1976). This further distinguishes *Moore-McCormack* for that decision, resting on the APA for jurisdiction to review, did not involve a congressional contract.

Next, the concurring opinion cites *Jonal Corp. v. District of Columbia*, 533 F.2d 1192 (D.C.Cir.), *cert. denied*, 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976), for the proposition that "the proper foundation for our decision is the due process clause of the fifth amendment." That case, however, was not decided on constitutional grounds apart from the Wunderlich Act but squarely on the Act since it involved a government contract. What the Court of Appeals said in that case supports my dissent,

---

4. The legislative and judicial history is set forth by the Supreme Court in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), *United States v. Anthony*

*Grace & Sons*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), and *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

squarely. It held that the fact that board membership was appointed by the District of Columbia Corporation Counsel who defended the case before the board did not per se violate the due process clause and that absent personal bias or pecuniary interest of the board the fact that the board members were so selected was not improper. Importantly, the case also stands for the proposition that under the Wunderlich Act the terms "arbitrary and capricious" and "grossly erroneous" establish the appropriate constitutional due process standard. Finally, nothing in the *Jonal* case remotely suggests any right to a *de novo* review of a board's decision. On the contrary, the opinion makes plain that the due process standard, as defined by the Act's terms, applies to the board's *decision*, not to its procedures in reaching that decision. This accords with the Supreme Court's opinion in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), where it was made clear that the Wunderlich Act is an Act to "permit review" and that review is of the board *decision*. See also the statute in note 1, *supra*. It accords, also, with *Radiation Technology, Inc. v. United States*, 177 Ct.Cl. 227, 366 F.2d 1003 (1966), which held that an ad hoc board of contract appeals does not necessarily offend due process simply because of the manner of its composition.

Next, the concurring opinion states a proposition to which no one can object. "It is well settled that a core element of due process is the assurance of an impartial decisionmaker." The trouble with the proposition as used here is that the concurring opinion fails to show how in the context of Wunderlich Act review the decisionmaker here is not impartial. By inference, the same suspicions and appearances and possibilities for evil that motivate the Chief Judge's opinion are at play here too. Oddly, however, the cases cited are not contract cases so they do not lead to the result achieved. One is a traffic case, one a Medicare case, and three are criminal cases. Yes, an impartial decisionmaker is important and necessary. Whether there was such a decisionmaker here can be determined by application of Wunderlich Act standards, as Congress intended and the governing precedents mandate. Innuendo that a contracting officer or board have acted improperly will not support a disregard of statutory limitations on our jurisdiction where the totality of such behavior, suspicious as it is, falls short of fraud or is not shown to have led to error impacting on the board decision in violation of Wunderlich Act guidelines for the adjudication of these cases.

I have extended this dissent only because of the importance of the issue and to illustrate that the new ground plowed today is fertile soil for trouble and that my brothers who constitute the majority here do not even agree between them on how to achieve the result they have reached. I had thought the law was settled in these matters after the Supreme Court had reversed this court in its miscellaneous attempts to get around the Wunderlich Act. In *Bianchi*, 373 U.S. at 716, 83 S.Ct. at 1414, the Supreme Court said that the legislative history of that Act "leaves little doubt that the review intended was one confined to the administrative record." While the Court there repudiated *de novo* trials in our court in cases under the Act and the disputes clauses, for that was the issue in *Bianchi*, it spoke more broadly in referring to the legislative history. The Supreme Court said:

> It is our conclusion that, apart from questions of fraud, determination of the finality to be attached to a departmental decision on a question arising under a "disputes" clause must rest solely on consideration of the record before the department. This conclusion is based both on the language of the statute and on its legislative history. [373 U.S. at 714, 83 S.Ct. at 1413.]

Again, at 715, 83 S.Ct. at 1413, the Supreme Court said—

> * * * that no *de novo* proceedings may be held. * * *

Moreover, the standards of review adopted in the Wunderlich Act—"arbitrary," "capricious," and "not supported by substantial evidence"—have frequent-

ly been used by Congress and have consistently been associated with a review limited to the administrative record. [Footnote omitted.] The term "substantial evidence" in particular has become a term of art to describe the basis on which an administrative record is to be judged by a reviewing court. * * *

The most recent statement of the Court of Claims on the scope of review in Wunderlich Act (41 U.S.C. §§ 321, 322) cases, was in *National Civil Service League v. United States*, Ct.Cl., —— Ct.Cl. ——, No. 330–79C (slip opinion of February 25, 1981). There the court said:

At the outset we point out that our authority to review a decision of a Board of Contract Appeals under the Wunderlich Act * * *, such as that involved in this case, is limited to a determination of whether the Board's findings are fraudulent, arbitrary, or capricious or so erroneous as to imply bad faith, or are not supported by substantial evidence, and whether the Board's decision is erroneous as a matter of law. *See United States ·v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); *Marley v. United States*, 191 Ct.Cl. 205, 213, 423 F.2d 324, 328–329 (1970); * * *. Therefore, we examine the decision of the Board subject to these limitations on our role as a reviewing court.

In *Marley v. United States*, 191 Ct.Cl. 205, 214, 423 F.2d 324, 329 (1970), we said:

* * * the court does not reweigh the evidence to determine whether it is in agreement with the findings of the Board. The inquiry is directed to whether on the disputed facts the Board had substantial evidence to support its determinations. Plaintiff has the burden of showing that no such evidence is in the record, or that the evidence contrary to the Board's findings is either overwhelming in itself or so detracts from the evi-

dence in support of the Board's findings as to render it less than substantial on the record as a whole. *Koppers Co., Inc. v. United States*, 186 Ct.Cl. 142, 149–51, 405 F.2d 554, 558–59 (1968); *Dean Constr. Co. v. United States*, 188 Ct.Cl. 62, 67–8, 411 F.2d 1238, 1241 (1969). Plaintiff has failed to meet this burden.

Nowhere do these precedents, and numerous others since *Bianchi, Grace*, and *Utah* which could be cited, speak of *de novo* trials or *de novo* review of administrative records by the court. The considerations are similar whether the *de novo* review is by trial or of the administrative record. In both instances a legitimate purpose is to be served in the conservation of judicial resources by rejecting *de novo* review. If the record is shown to be defective under the Wunderlich Act standards, the Supreme Court has said we could remand, or even enter judgment in limited circumstances discussed above where the board record is inadequate or unavailable for lack of authority or willingness to act. The available record here has yet to be examined to determine its adequacy to support the board decisions when tested by Wunderlich Act standards of review.

If we give a crabbed reading to the board's authority where it has stayed within its statutory sphere, we accept as valid the same policy considerations which Congress and the Supreme Court have already discarded. *United States v. Utah Constr. Co., supra*, 384 U.S. at 421 n. 18, 86 S.Ct. at 1559 n. 18. Pragmatic considerations militate against the result here. As the same members of this panel stated in *Robert McMullan & Son v. United States*, Ct.Cl. No. 582–79C (order entered December 31, 1980):

* * * "The Board of Appeals, as the original trier of fact, is in the best position to determine the credibility of the witnesses examined and the weight to be accorded to the testimony presented by the witnesses." *William A. Smith [Contracting Co.] v. United States*, 188 Ct.Cl. 1062, 1077, 412 F.2d 1325, 1333 (1969); *See Arundel Corp. v. United States*, 207 Ct.Cl. 84, 515 F.2d 1116 (1975).

I doubt the procedural fairness in a *de novo* review of a record where the trial judge cannot see and hear the witnesses and judge their credibility under cross-examination.

It is possible to conceive of a rare, far-out situation where there is prima facie fraud on a board's part or where, as in the criminal cases cited in the concurring opinion, the decider of the facts may have a personal, pecuniary conflict of interest in the outcome of the case. In such cases a fresh start is permissible under the Supreme Court's precedents on due process. But, I must reject the thesis of my colleagues that we can, without review of the administrative decision and only on the basis of suspicious circumstances arising from indiscreet behavior on the part of a contracting officer or board, disregard the board decision and without seeing any witnesses and in total disregard of Wunderlich Act standards, render a *de novo* decision on disputes arising under the contract and subject to the disputes clause. Rather, I say that if on Wunderlich Act review the board decision is sustainable under the Act's standards, then the lack of quality in the board is mooted as harmless error. If the board decision falls in whole or in part before the statutory standards, then the statute itself, as interpreted by the Supreme Court gives us ample authority to render full justice to the parties.[5]

I submit one final point. In *Bianchi*, 373 U.S. at 717, 83 S.Ct. at 1414, we have been cautioned against *de novo* procedures which create a heavy, additional burden in the time and expense required to bring litigation to an end. The contract in this case was entered into on August 10, 1964, which was in the year following creation of the board which has heard and decided the 41 claims which the court now has ordered

reviewed *de novo*. The petition was filed here on August 6, 1970. In 1975 administrative remedies were exhausted. Four years later, on September 18, 1979, the trial judge filed his decision on the procedural issue of board adequacy and recommended a trial *de novo*. The case has now been before the court for 5 years and the merits of it have not been reached. The administrative record has not been seen by my colleagues. I have seen it, and it fills a room. There are 5,500 pages of testimony and almost a thousand exhibits on the six major claims alone, Nos. 6, 7, 28, 29, 39, and 40. The findings and opinions on these six claims run to 149 pages. Now we order some hapless trial judge to start from scratch with this record, to make new findings, and to render an opinion without Wunderlich Act or any other guidelines and without seeing or having a chance to judge the credibility of the witnesses. Then, doubtless, his decision will be appealed to us. In *Bianchi*, 373 U.S. at 717, 83 S.Ct. at 1414, the Supreme Court said:

> * * * Thus in the present case judicial proceedings began in 1954, almost six years after completion of the departmental proceedings, and a final decision on the issue of liability was not rendered until 1959. This is surely delay at its worst, and we would be loath to condone any procedure under which the need for expeditious resolution would be so ill-served. Here, the procedure is clearly inconsistent with the legislative directive.

It may very well be that most of the members of this court and the trial judges will be eligible to retire before a final decision is rendered in the pending suit. What is done here reflects no credit on the judicial process, and it offends the clearly expressed intent of Congress and the Supreme Court. In sadness at this mischievous outcome, I can only say of my brothers, in the

---

5. Breach claims, of course, can be directly addressed by the court and I do not contest the court's treatment of any such claims here. Noted, also, is that this claim is not subject to the Contract Disputes Act of 1978, 92 Stat. 2383, 41 U.S.C. §§ 601–613 (Supp.II 1978), pursuant to which a party may be accorded trial in court to supplement an inadequate administrative record instead of remanding it to the board, as procedure prior to the 1978 Act requires. The court, without precedent, does not remand to the board here because of its perception of board bias. The board's decisions have been vacated without examination for adequacy.

words of my blessed Lord: "forgive them; for they know not what they do."