**BALTIMORE CONTRACTORS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 272–70.**

United States Claims Court.

April 30, 1987.

---

Robert D. Wallick, Washington, D.C., for plaintiff.

Lynn J. Bush, Washington, D.C., with whom was Assistant Atty. Gen., Richard K. Willard, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

On June 1, 1964, the United States, acting through the Architect of the Capitol (Architect) in his role as contracting officer, issued an invitation for bids for the construction of two underground parking garages and related facilities in Washington, D.C. Plaintiff, Baltimore Contractors, Inc., was awarded Contract No. ACho–264 for a fixed price of $11,770,000 on August 10, 1964. A variety of alleged changed conditions, changes to the contract, and delay claims were filed throughout the con-

struction of the garages, requesting an equitable adjustment to the contract in the total amount of $1,760,000 and a 241–day extension of time for performance.

Although all claims before the House Office Building Commission Board of Contract Appeals were eventually settled, denied, or dismissed, plaintiff filed actions in the United States Court of Claims in 1970 and 1975 alleging lack of due process in the administrative proceedings. The trial judge allowed a trial *de novo* on all contract claims as a result of finding the administrative remedy defective, but on appeal the Court of Claims remanded the case for a *de novo* decision.[1] After careful review of a truly voluminous record, this court finds defendant liable for some of the alleged changed conditions, changes, and delay claims.

## FACTS

The two underground garages were constructed in adjacent city blocks, designated Squares 637 and 691. Square 637 is immediately south of the Rayburn House Office Building. Square 691 is located immediately south of the Longworth House Office Building. The two garages were part of the same major construction project as the then-new Rayburn House Office Building.

The garages have three floors for parking plus top decks with grass areas, walks, and fountains for public use. The concrete exterior of the garages is faced with granite. The foundations and bottom floors of the two garages are concrete slabs or mats, five or more feet thick, and the bottom or subgrade elevations of these base slabs are as much as 48 feet below existing ground levels.

The contract called for completion within 18 calendar months. The notice to proceed, which directed plaintiff to begin performance on October 7, 1964, established an initial completion date of April 7, 1966. The Architect accepted beneficial occupan-

cy on September 18, 1967, which was 529 calendar days after the originally specified completion date of April 7, 1966. The Architect allowed a total of 288 days in time extensions, but also assessed a total of $60,250 in liquidated damages for 241 days at the contract specified rate of $250 per day.

A number of disagreements arose during performance of the contract. Many of these centered around excavation for the garages, design and construction of a bracing system to support the excavation, and subsequent backfilling around the garages. When the disputes were not otherwise resolved, plaintiff submitted a series of claims for equitable adjustment to the Architect for decision. Plaintiff filed its first of 32 appeals from adverse decisions of the Architect on September 16, 1968 with the House Office Building Commission Board of Contract Appeals (HOBC), which was staffed on a part-time basis by employees of the General Accounting Office. Of the 32 appeals, three were settled prior to hearing. The remaining appeals were denied or dismissed by the Board.

On August 6, 1970, plaintiff filed a petition in the United States Court of Claims for review of the decision of the Board. On September 8, 1970, the United States filed a motion to dismiss the petition on the ground that plaintiff had failed to exhaust its administrative remedy under the disputes clause. Although the motion was denied on January 15, 1971, the court ordered the proceedings to be suspended for a period of six months from that date to await completion of the administrative proceedings then pending before the Board. These administrative proceedings were not concluded until 1975, some five years after the petition was filed.

Plaintiff had moved in April 1974 that judicial proceedings be resumed. It reiterated the grounds set forth in its petition filed in 1970 (and for three years prior

---

1. The Court of Claims remanded this case to the trial court with the following directive:

> We hold that the Board proceedings in this case were so defective that the Board's findings and decision are not entitled to the usual finality accorded Board decisions under the Wunderlich Act, 41 U.S.C. §§ 321–22. We

> conclude, however, that the plaintiff is not entitled to a trial *de novo*, but only to a *de novo* decision, based on the record before the Board....

*Baltimore Contractors, Inc. v. United States,* 210 Ct.Cl. 678, 226 Ct.Cl. 394, 395, 643 F.2d 729, 729 (1981).

thereto before the HOBC) that the proffered administrative remedy was defective and inadequate, and therefore, need not be exhausted. In an Order dated March 3, 1976, the trial judge allowed a trial *de novo* on the issue of whether or not the administrative remedy was inadequate or deficient. Following a trial on that issue, the trial judge found that the administrative remedy was defective and a *de novo* trial was required on all contract claims.

On appeal, the United States Court of Claims concluded that the administrative proceedings before the Board were indeed inadequate, but disagreed with the trial judge's conclusion that all of the issues would have to be retried *de novo*. The United States Court of Claims remanded the case for a *de novo* decision, based upon the administrative record before the HOBC, vice a trial *de novo*.[2]

### DISCUSSION

Plaintiff's claims arising out of its construction of the underground garages are discussed in the following order: changed conditions, changes to the contract,[3] unreasonable delays, and breaches of the contract. Although quantum is not determined by the court, this Opinion on liability is intended to provide guidance in resolving damage issues.

### A. *Changed Conditions*

There are two types of changed conditions that are compensable under the contract's changed condition clause.[4] The first, Type 1, are those that differ materially from what is indicated in the contract and the second, Type 2, are those that differ materially from those ordinarily encountered. *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 435 F.2d 873 (1970).

### 1. *Changed Soil Conditions*

Plaintiff alleged that it encountered subsurface conditions at the site that dif-

---

2. Judge Bennett summarized this protracted litigation as follows:

 The contract in this case was entered into on August 10, 1964, which was in the year following creation of the board which has heard and decided the 41 claims which the court now has ordered reviewed *de novo*. The petition was filed here on August 6, 1970. In 1975 administrative remedies were exhausted. Four years later, on September 18, 1979, the trial judge filed his decision on the procedural issue of board adequacy and recommended a trial *de novo*. The case has now been before the court for 5 years and the merits of it have not been reached. The administrative record has not been seen by my colleagues. I have seen it, and it fills a room. There are 5,500 pages of testimony and almost a thousand exhibits on the six major claims alone, Nos. 6, 7, 28, 29, 39 and 40. The findings and opinions on these six claims run to 149 pages. Now we order some hapless trial judge to start from scratch with this record, to make new findings, and to render an opinion without Wunderlich Act or any other guidelines and without seeing or having a chance to judge the credibility of the witnesses.

 *Baltimore Contractors, Inc. v. United States*, 210 Ct.Cl. 678, 226 Ct.Cl. 394, 424–25, 643 F.2d 729, 746 (1981) (Bennett, J., dissenting).

3. Plaintiff's claim that it was denied optional methods of performing parts of the contract by the contract is not considered by the court to be a separate and distinct claim for an equitable adjustment under the changes/changed condi-

tions clauses. Indeed, in its reply brief, plaintiff acknowledged that this argument was merely a foundation for other claims.

4. The changed condition clause from the contract read as follows:

 1-04. Changed Conditions.—The Contractor shall promptly and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he had given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Article 1-06 [Disputes Clause] hereof.

fered materially from those indicated by the contract borings (a Type 1 changed condition). The relevant considerations for plaintiff's claim are: (a) whether the conditions encountered by plaintiff differed materially from those indicated in the contract documents, (b) could the changed condition have been reasonably anticipated from the site examination and review of the contract documents, and (c) did plaintiff, in fact, rely on its interpretation of the contract documents. *Baltimore Contractors, Inc.,* GSBCA No. 4808, 80-2 BCA ¶ 14,539 at 71,671 (1980).

### a. *Material Difference in the Conditions Actually Encountered*

"The ultimate question in every case is whether the conditions encountered by a contractor were materially different from those reported in the specifications of the contract." *Wm. A. Smith Contracting Co. v. United States,* 188 Ct.Cl. 1062, 1088, 412 F.2d 1325, 1339 (1969) (citing *Fehlhaber Corp. v. United States,* 138 Ct.Cl. 571, 585, 151 F.Supp. 817, 825 (1957)). In the present case, thirty-two soil boring samples were shown on the contract drawings. These boring logs depicted a recorded standard penetration resistance ("N" count value), which indicated the shear strength of the soil. The shear strength values were an important cost consideration for plaintiff's bid because shear strength was used to determine the capacities of the excavation sheeting, bracing and anchors. After plaintiff began work on the project, plaintiff became wary of the "N" values shown on the contract borings and directed additional soil borings to be made. Two sets of additional borings were made for plaintiff by two independent boring contractors, supervised by two different consulting engineers, and inspected by representatives of the Architect. These independent borings, evidenced "N" counts that were 2 to 3 times less than the shear strengths indicated by the contract borings on the plans. Thus, this court finds that the "N" counts were substantially different from that indicated in the borings. *See Blount Bros. Constr. Co.,* ASBCA No. 4780, 59-2 BCA ¶ 2316 (1959) (holding that a very fine silty substance encountered by plaintiff was substantially different from the clay indicated by the borings, which constituted a changed condition).

### b. *Anticipation of the Changed Condition*

A second consideration is whether the changed condition could have been reasonably anticipated from an examination of the site or from a study of the contract drawings and specifications. *Smith,* 188 Ct.Cl. at 1086, 412 F.2d at 1338. Defendant emphasizes exculpatory language in paragraph 4-04 and paragraph 5-04, which are identical except for numbering and read, in part, as follows:

> 4-04. Boring information.—(a) Borings indicating soil conditions have been taken at the site. Information obtained from these borings is shown on the drawings. The Government however, makes no representations concerning soil and other subsurface conditions to be encountered during the work, and it will not be responsible for the accuracy of the information on soil and other subsurface conditions shown on the drawings.
>
> (b) The Contractor shall make his own interpretation of soil, ground water and other subsurface conditions which may affect methods or costs of execution of the work.

Defendant argues that even a cursory reading plainly shows that these paragraphs allow the government to disavow any liability for soils that differ from the soils indicated in the boring reports. The court, however, agrees with *United Contractors v. United States,* 177 Ct.Cl. 151, 368 F.2d 585 (1966), that the boring information had the effect of "inviting [plaintiff's] consideration in the preparation of bids." *Id.* at 165, 368 F.2d at 597. Although bidders in the present case were instructed to make their own interpretation of the subsurface conditions, "[a] bidder does not have the obligation to make a scientifically educated and skeptical analysis of the contract, and is entitled to rely on the contract indications if he has made a reasonable site inspection." *Higgins,*

AGBCA No. 76–128, 79–2 BCA ¶ 14,050 at 69,064 (1979). The records show that plaintiff made a reasonable site inspection, and it was not necessary to plaintiff's site examination to "include a probe of the Government's test boring holes." *Id.* In terms of the strength of the soil, the court finds that there was nothing in the contract to alert plaintiff that the strength of the soil was anything other than that indicated by the contract borings. This court holds that plaintiff simply did not "expect or have reasonable cause to anticipate, from information either within or without the confines of its agreement, that it would encounter" shear strengths that were 2 to 3 times less than those represented by the contract borings. *United Contractors*, 177 Ct.Cl. at 168, 368 F.2d at 599.

In addition, the court recognizes the need to "prevent bidders from adding high contingency factors to protect themselves against unusual conditions discovered while excavating, for obviously no one can ever know with certainty what will be found during subsurface operations." *Id.* Plaintiff's use of the contract borings indicating the strength of the soil removed at least some of the gamble of excavations down to 48 feet. *See id.* (quoting *Kaiser Indus. Corp. v. United States*, 169 Ct.Cl. 310, 323, 340 F.2d 322, 329 (1965)).

This court is also persuaded that defendant failed to furnish plaintiff with relevant soil reports. During precontract investigations of subsurface soils by the Architect samples of the soils had been taken at various locations and subjected to laboratory tests to determine their shear strengths. The results of the testing were included in a "1963 Soils Report to the Capitol Architect," but plaintiff did not receive a copy of this report until more than seven months after award of the contract. The data in the Soils Report were inconsistent with the "N" counts from the contract borings and indicated the presence of subsurface soils with substantially lower shear strengths, more akin to plaintiff's post-award boring samples. The laboratory soil test data would have alerted plaintiff to the fact that the contract "N" values were high. The Architect's disclosure of some data and its failure to disclose other available information had the effect of misleading the contractor with respect to the soil conditions existing in the construction area. *See Smith*, 188 Ct.Cl. at 1086–87, 412 F.2d at 1338 (citing *Leal v. United States*, 149 Ct.Cl. 451, 460, 276 F.2d 378, 383 (1960)). Accordingly, plaintiff could not have reasonably anticipated from its site investigation and review of the contract documents that a changed soil's condition existed.

### c. *Reliance*

With respect to plaintiff's reliance on its interpretation of the contract, plaintiff argues that it reasonably relied on the contract borings to determine the shear strength of the soil. Indeed, during the design and construction of an alternate bracing system, the Architect and his consultants were of the view that "shear strength of the soil can be estimated from the boring information on the contract drawings." Letter from Architect to plaintiff (Dec. 14, 1964). During other design discussions, the Architect's soils consultant advised plaintiff that "shear strength was equal to approximately 150 times the split spoon driving resistance (psf)." These split spoon driving resistances were reported with the 32 boring logs in the contract and the correlation between driving resistances and shear strength was used in the design analysis of the anchors for the excavation bracing. The court is persuaded that plaintiff reasonably relied on the shear strengths indicated by the contract boring data to design the anchors.

After a thorough analysis of all the relevant considerations for a Type 1 Changed Condition, the court is persuaded that plaintiff is entitled to an equitable adjustment for "subsurface ... conditions at the site differing materially from those indicated in this contract...." Changed Conditions Clause, § 1–04.

### 2. *Changed Water Conditions*

 Plaintiff states that the presence of a sanitary sewer water line at the site was a Type 2 changed condition. In order to prevail, plaintiff must establish that the

conditions encountered were unknown, and of an unusual nature that differed materially from conditions normally encountered as inherent within the meaning of this and similar contracts. *Charles T. Parker Constr. Co. v. United States*, 193 Ct.Cl. 320, 333–34, 433 F.2d 771, 778 (1970).

Bidders may rely upon the information given to them by the government when making their bid. *Womack v. United States*, 182 Ct.Cl. 399, 412, 389 F.2d 793, 801 (1968) (citing *Snyder-Lynch Motors, Inc. v. United States*, 154 Ct.Cl. 476, 479, 292 F.2d 907, 909–10 (1961)). The contract drawings did not indicate the presence of a sanitary sewer line; only a storm sewer was shown. The presence of the sewer water line made it necessary for plaintiff to install an injection pumping system to relieve the water. Since the government's contract drawings did not reveal a sanitary sewer line, plaintiff was reasonable in assuming there was not one when making its bid. *See id.* The court finds that this would not be recognized as a normal or expected situation to be encountered under such contracts and within the meaning of this contract. Although almost all excavation projects encounter the presence of some water, the presence and amount of sewage in the present case was unknown and of an unusual nature that differed materially from ordinary conditions and was not inherent in the work required in this contract. *See John A. Johnson Contracting Corp. v. United States*, 132 Ct.Cl. 645, 654–57, 132 F.Supp.

698, 702–703 (1955) (unexpected water retention qualities, which caused disintegration of access roads constructed by others, was a changed condition); *Paccon, Inc.*, ASBCA No. 7643, 62 BCA ¶ 3546 (1962) (difficulties encountered with the excavation of clay material constituted an unknown and unusual condition within the meaning of the contract).

Defendant argues that even if the presence of sanitary sewer water was a changed condition, Article 404(d)[5] and 412(b)[6] relieves defendant of any liability since plaintiff had the responsibility to remove all "ground water." However, the court is persuaded that "ground water" does not include sewage water under a street from an undisclosed, obviously badly leaking sanitary sewer line. The presence of a sanitary sewer line and sanitary sewage at the site was a changed condition which could not be negated by including a contract clause that broadly excluded defendant from all liability. *See R. Nash & J. Cibinic, Federal Procurement Law 1284 n. 1 (3d ed. 1980)*. The court finds that plaintiff is entitled to an equitable adjustment for costs incurred by the contractor in the special handling of the water from the undisclosed sanitary sewer water line and loss of time as a result of the changed condition.

**B. *Changes to the Contract***

■ The contract included a standard changes clause (Provision 1–03)[7] which em-

---

5. Article 4–04(d) states in part:
 Contours of estimated ground water elevations on the site prior to start of construction in the vicinity of the site are indicated on the drawings to aid the Contractor in evaluating the ground water conditions he may encounter at the site. No additional compensation shall become due to the contractor as a result of real or alleged changes in, or variations from, the ground water elevation shown on the drawings. All risks in respect to ground water conditions of any and every description shall be assumed by the contractor and are deemed to be compensated for by the contract price.

6. Article 4–12(b) states: "for the purpose of these specifications, ground water shall be deemed to be any free water in the soil below

existing grade, regardless of its amount or source.".

7. Specification 1–03 stated the following:
 1–03. Changes.—The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawing and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this article must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* that the Contracting Officer, if

braced constructive as well as formally ordered changes. Plaintiff alleges that by refusing to allow steeper excavation slopes, rejecting the plaintiff's extrapolated earth pressure diagram, employing the pretest anchor system, and requiring the hiring of an additional engineer, defendant directly, in some instances, and constructively in others, changed the contract, thereby entitling plaintiff to equitable adjustments.

### 1. *Slopes*

Plaintiff claims that defendant allowed steeper excavation slopes in conjunction with an alternative bracing design and then withdrew permission, all of which constituted a constructive change. Under the terms of Article 5–08(e) [8] of the contract, plaintiff had the option of either constructing the conventional excavation bracing system shown on the drawings or designing an alternative system, subject to approval, which would be at least of equal strength and provide at least equal support to that shown on the contract drawing.

The contract required plaintiff to cut slopes on the exterior berms at a ratio of 1.0 foot vertical (v) to 2.0 feet horizontal (h), but plaintiff requested and received permission from the Architect to cut slopes on the exterior berms at a ratio of 1.0 v to 1.5 h, in conjunction with an alternate bracing system. Eight days later, however, the Architect rescinded permission even though the slopes on the exterior berms in Square 691 had already been cut to 1.0 v to 1.5 h in the eastern half of the square and to about 1.0 v to 1.7 or 1.8 h in the remainder of the square. The court acknowledges the Architect's authority to rescind the permission previously granted, but not on a no-

cost basis. Since the contract had been amended by the Architect's approval of the alternative bracing system, an integral part of which included the use of steeper slopes, his later withdrawal of that approval constituted a change to the contract, thereby entitling plaintiff to an equitable adjustment. *See Southwest Welding and Mfg. Co. v. United States*, 188 Ct.Cl. 925, 413 F.2d 1167 (1969) (contractor was entitled to an equitable adjustment under the changes clause for his costs in complying with the government's direction to remove and replace welds); *Martin J. Simko Constr., Inc. v. United States*, 11 Cl.Ct. 257, 291–92 (1986) (allowing equitable adjustment when contracting officer approved use of existing road material through proper procedures but later forbade use of the existing material and directed use of more expensive off-site material).

### 2. *Anchors*

Plaintiff contends that defendant required a substantial increase in pretesting some of the anchors in the eastern half of square 691, which constituted a change to the contract. This claim is separate from but related to the previous "Slope" claim. Defendant argues that plaintiff did not meet requirements in Article 5–08(e), which state that the alternate system must be of at least equal support and strength as the one shown on the contract.

The purpose of pretesting is to assure that the system used is strong enough to support construction. Under Article 5.08(e), *supra*, of the contract, plaintiff's election to adopt an alternate system, placed upon it the burden of showing that its alternate system met the requirement.

he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 1–06 hereof. But nothing provided in this article shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed. (Emphasis in original).

**8.** Article 5–08(e) reads as follows:

The Contractor may elect to adopt the excavation bracing and sheeting system as shown on the drawing or he may design an alternative system, subject to approval; in either case he shall submit complete shop drawings for approval in accordance with provisions of Article 2–21. If an alternative system of excavation bracing is proposed, it shall be at least equal to that shown on the contract drawings and specified herein at no additional cost to the Government.

Defendant must allow approval of plaintiff's alternate method if the results of the test meet the requirements. *See Frank Briscoe Co.,* GSBCA No. 3455 73–1 BCA ¶ 10,008 (1973) (holding that where the contract gives the contractor the right to use any method he chooses, he may use any such method not likely to cause some damage to the project). The court in *Jack Stone Co. v. United States,* 170 Ct.Cl. 281, 344 F.2d 370 (1965), stated that the contracting officer had the right to exercise judgment to determine whether the item proposed is equal in quality and performance. *Id.* at 287–88, 344 F.2d at 374. However, that power does not extend to a refusal to allow a replacement that is equal or to impose unreasonable testing requirements. *See Consolidated Diesel Electric Co. v. United States,* 209 Ct.Cl. 521, 533 F.2d 556 (1976).

The consultants to the Architect, Mr. Lert and Mr. Sowers, advised the Architect on December 8, 1964, that plaintiff's proposed alternate anchors could hold the load in the eastern half of Square 691. Despite this advice, the Architect withheld approval of all anchors and marked on the return drawings "Approval deferred pending satisfactory tests." [9] When the anchor tests proved satisfactory, defendant could not insist on more testing without amending the contract. The court relies on the objective opinion of the Architect's consultants in determining that the alternate anchor system should have been considered equal to the original anchor system when they advised the Architect that the alternate proposed anchors would support the load. Thus, the court finds that plaintiff is entitled to an equitable adjustment for all tests performed on the eastern half of Square 691 after being advised that the anchors would support the load. *See Szemco, Inc.,* ASBCA No. 9892, 65–1 BCA ¶ 4535 (1965) (holding that the government was not relieved of the obligation to compensate contractor under the Changes Clause by the fact that the government's requests for additional tests were justified).

### 3. *Employment of an Additional Engineer*

Plaintiff claimed that the Architect required plaintiff to hire special engineers to install anchors for the excavation bracing, which allegedly constituted a change to the contract. Defendant argued that plaintiff's initial subcontractor did not meet the qualifications required under the contract.

Article 2–20(a) of the contract states that "each subcontractor shall be experienced and capable of performing in a satisfactory manner all work in his branch" and Article 5–06(b) provides that:

All excavation bracing ... shall be installed and maintained by an approved organization having specialized work of this type as its primary and regular field of operation for at least ten years and having performed satisfactorily work of this type in comparable importance and magnitude.

Immediately after the notice to proceed had issued in the fall of 1964, plaintiff's subcontractor, Coakley & Booth (C & B), experienced with excavation bracing and with earth anchorage systems generally, was approved by the Architect of the Capitol without limitation pursuant to Article 5–06(b). In January 1965, plaintiff employed a 2d-tier subcontractor with prior experience in installing drilled-in-place earth tieback anchors. Two months later, the Architect required that the project be under the supervision of an engineer meeting the following qualifications:

(a) Be a registered professional engineer.

(b) Hold a masters degree, or its academic equivalent, in soils engineering.

(c) Have satisfactory experience in the design and installation of excavation bracing and sheeting systems employing tie-back earth anchors of the type proposed on this project.

(d) Be able to make field decisions regarding construction procedures and design necessary to meet varying on-site conditions as they may arise.

**9.** The delay in approval of anchors will be discussed later in this Opinion.

Letter from Architect to plaintiff (Mar. 16, 1965).

Defendant's argument that it did not order or require plaintiff to employ a second 2d-tier contractor, but only to provide specifically experienced engineering services as required by the contract is without merit. The quote above indicated that defendant considered plaintiff, through C & B, unable to meet all of these specific requirements, which for the first time gave some small degree of objectivity to Article 5–06(b). Therefore, in compliance with the Architect's March 16, 1965 letter, plaintiff employed another 2d-tier subcontractor to complete the work. Although plaintiff's subcontractors may not have specifically met each requirement listed by the Architect in his letter, the court finds that as a matter of contract interpretation, plaintiff was adequately qualified through its subcontractor to perform the drilled-in-place earth tie-back anchor work. C & B may not have previously installed the exact type of tie-back anchor that was used on this job, but C & B was experienced in comparable subsurface work that afforded a sufficient background to be able to properly evaluate drilled-in-place earth tie-back anchors. Mr. Booth, one of the principals of C & B, had over thirty years experience in foundation construction work and had installed numerous tie-backs of other types. These same principles were used to determine the proper bracing and anchor system for the present situation. In addition, plaintiff's employment of its first 2d-tier subcontractor with prior experience in installing drilled-in-place earth tie-back anchors provided any specialized experience that C & B may have lacked. Thus, plaintiff is entitled to an equitable adjustment for additional expenses, if any, incurred through having to hire another 2d-tier engineer.

Even if plaintiff's subcontractors were not fully qualified, the court is convinced that the Architect waived the opportunity to challenge, without cost, their qualifications in midstream. C & B was approved at the outset under the terms of the contract, without limitation. The Architect and his consultants were aware that C & B had no direct prior experience with drilled-in-place earth tie-back anchors, and the contractor proceeded with the work without the Architect questioning their qualifications until five months later. Thus, plaintiff is entitled to an equitable adjustment for the hiring of a special second engineer on the basis of defendant's waiver, irrespective of any possible technical deficiency of the subcontractor's qualifications.

### 4. Rejection of Extrapolated Earth Diagrams

Plaintiff alleged that defendant arbitrarily and improperly insisted upon the use of earth pressure diagrams that had been furnished for a more gradually sloped exterior berm. Defendant stated that it did not reject plaintiff's earth pressure diagrams, and that even if it had, there would only be some minor reduction in earth pressure with the steeper slope.

It is a general principle of soils engineering that the total load on excavation bracing is reduced as the excavation slope is steepened. Accordingly, when defendant gave plaintiff permission to cut steeper slopes on lot 691, plaintiff prepared calculations on the reduced earth pressures on the excavation bracing and received general approval on the calculations from the Architect's consultant. However, the Architect later wrote the following in response to a request from plaintiff for advice about the effect the change of the slopes would have on earth pressures used in the design of the excavation bracing:

(a) for any total depth of excavation measured from original grade to final subgrade, the 1½ on 1 slope of the berm will not substantially change the total earth pressure to be resisted by the bracing system and this total force shall therefore remain the same as shown on the contract drawings for a 2 on 1 slope for the berm.

(b) This total force shall be expressed as the area of a trapezoid similar to and having the same areas of trapezoidal distribution shown on the contract drawings.

Letter from Architect to plaintiff (Dec. 3, 1964).

Contrary to defendant's argument, the court considers this response from the Architect to be an unequivocal rejection of plaintiff's request for a reduction in the design load on the bracing. Plaintiff was required to redesign the excavation bracing system to reflect earth pressure from a berm sloped at 1.0 v to 2.0 h, even though plaintiff was actually allowed to use a berm sloped at 1.0 v to 1.5 h. Thus, plaintiff is entitled to an equitable adjustment under the contract for its redesign efforts.

Defendant also argued that the change in the earth pressure from the use of steeper slopes is insubstantial. Indeed, plaintiff's own engineer stated that the Architect's response was "a rather arbitrary direction, but within responsible limits" and that "it did not work too much hardship." Although the court allows an equitable adjustment on this claim, the quantum aspect should be reviewed very conservatively in view of plaintiff's admission that the change of slopes had only minor impact on the bracing design. ·

### 5. *Backfill Inspection*

■ As the two underground garages were completed, the remaining areas outside the walls were restored to original ground levels by backfilling with borrow materials. The Architect employed an engineering firm to inspect and control the backfill. In lieu of the conflicting facts asserted by the parties on plaintiff's claim that the backfill was not properly inspected, the court relies on uncontested evidence that shows abuse by defendant in selecting proctor [10] control curves. On direct examination, defendant's engineers defended its selection of control curves by explaining that it had made at least "a couple" of one point proctor check plugs [11] every week and that the check plugs validated their selections. However, during cross-examination, and in response to repeated inquiries from plaintiff as to records of those check plugs, one of the field inspectors produced a packet of papers showing that only four check plugs could be proffered to support the selection of proctor curves from a three and one-half month period. Also included in the packet was a copy of a note which had been sent from one field inspector to the other, which read as follows:

Charlie; here are all the check plugs I can find from 1–1–67. One is for Proctor # 18. I keep 19 & 20 here, because I have not finished them yet and we aren't using them.

I believe that I did about two more checks, but I also believe they verified 106 # /pt 3 and I did not keep them.

Notice that plugs dated 3/1/67 verify # 16, 113.9. This could cover us to that date.

If we could verify 3–8–67 one week from the date of the check plugs, to 4–7–67 we should be OK. I think we can arrange this. My only worry is that with # 18–110.2 there will be a notable change in % compaction. The weights are coming well in the safe passing range for 113.9 today and *all* test [sic] passed yesterday with 113.9 max. D.

Ref. enclosed report most %'s over 100, one is 104.6, this would be 108.2% using 110.2.

10. The T–99 method referenced in specifications is often referred to as the standard proctor method. Under this method, control samples are taken from the backfill to be placed. For each control sample, its dry density (dry weight in pounds per cubic foot or pcf) is determined under prescribed laboratory conditions over a range of different moisture contents. The dry density of a field sample is compared to the maximum dry density of the proctor curve for the control sample, which is believed to most nearly correspond to the field sample. The comparison is expressed as a percentage. Ninety-eight percent compaction means that the dry density of the field sample is 90 percent of the maximum dry density of the control sample/curve selected for purposes of the comparison. The difference between the moist and dry densities measures the moisture content. A curve is plotted for each control sample, comparing the compacted dry densities versus their corresponding percentages of moisture. For the clayey soils used on backfill on this project, each proctor curve peaks at a particular point. This curve is called a control or proctor curve.

11. Check plugs are samples taken periodically from the compacted backfill to confirm the application of a proctor curve to the soil being tested for compaction.

Thus, over the three and one-half month period involved, only six check plugs were made: the four enclosed and the two thrown away because they verified a lower proctor curve. That represents a frequency of about one proctor every two and one-half weeks, which is far less than the field inspectors' testimony that check plugs were made at least twice a week. The only comment by a field inspector on the above-quoted note was that it "doesn't sound very good."

In sum, defendant did not follow standard procedures for determining proctor curves and acted arbitrarily in their selection as evidenced by the following: (1) the destruction of data that did not support defendant's position, (2) the inadequate and misrepresented number of check plugs, and (3) the field inspector's intention to obtain only those plugs that would support defendant's position. Thus, plaintiff is allowed an equitable adjustment under the contract for additional expenses and time resulting from defendant's misinspection of the backfill.

### 6. *Backfill Compaction*

As construction of the underground garages was completed, plaintiff was required to backfill the excavated areas remaining outside the walls and also over the top decks of the two garages. Plaintiff contends that compaction to 98 percent density in areas planned for grass was not a requirement of the contract.

Section 4.11(b) of the contract provides in pertinent part:

> Unless otherwise specified all backfill ... shall be compacted mechanically to a minimum density of 98% of maximum density as determined by AASHO standard laboratory method of test for compaction and density of soil, T–99.... In all areas planned for grass or other planting, backfill shall comply with the requirements of the "Landscape Development-Top Soiling, Sodding and Planting Section.

Plaintiff argues that the natural meaning of the language of the last sentence of § 4.11(b) excepted all backfill beneath the grass sodded areas from the 98 percent compaction requirement imposed by the first sentence. In other words, plaintiff suggests that backfill under the top soil was subject only to the loose compaction requirement for top soil. The court finds this interpretation superfluous because the only reference to compaction of material in the "Landscape Development"[12] is to the loose compaction requirement for topsoil. A reading of the specifications as a whole makes it clear that backfill was to be compacted to 98 percent and topsoil was to be loosely compacted.

---

**12.** The landscape section reads as follows:

SECTION XXXII. LANDSCAPE DEVELOPMENT—TOPSOILING, SODDING AND PLANTING

\* \* \* \* \* \*

32–02. *Scope of Work.*—The Contractor shall perform all work required for furnishing and placing topsoil in the areas and of the depths indicated on the applicable drawings; for furnishing and placing sod, including soil improvement, on the areas indicated on the applicable drawings; for furnishing and planting of all trees of the kind and size specified and/or shown at the prescribed locations, and for furnishing and installing of pipe frames and block paving at the prescribed locations, all in strict accordance with the contract documents. The Contractor's attention is directed to Article 2–50 for special construction requirements.

\* \* \* \* \* \*

32–1–02. *Topsoil.*—(a) Topsoil shall be natural, friable, fertile soil possessing the characteristics of topsoil which produce heavy growth of crops, grass or other vegetation.

\* \* \* \* \* \*

32–1–07. *Scarifying subgrade.*—Prior to placement of topsoil all areas designated to receive topsoil shall be scarified to a depth of approximately 2 inches.

32–1–08. *Placement of topsoil.*—(a) Topsoil shall be placed in the areas designated and to the lines and grades indicated on the drawings. The topsoil shall be placed in successive horizontal layers of from 8 inches to 10 inches in loose depth for the full width of the cross-section. Each layer shall be lightly compacted by such methods as approved by the Architect. Heavy compaction is not desirable and will not be permitted. The firmed grade of the topsoil fill shall be approximately one (1) inch below proposed finished grade so as to allow sufficient depth for placement of sod.

■ Even if the court were persuaded by plaintiff's interpretation that the 98% compaction was eliminated in certain backfill areas, plaintiff's conduct and correspondence during the contract indicated otherwise. It is a well established principle of contract interpretation that when the parties agree to an interpretation prior to the controversy, such interpretation shall be given great if not controlling weight. *Chase & Rice, Inc. v. United States*, 173 Ct.Cl. 740, 746, 354 F.2d 318, 321 (1965); *Inland Empire Builders, Inc. v. United States*, 191 Ct.Cl. 742, 755, 424 F.2d 1370, 1378 (1970). Plaintiff, through a subcontractor, compacted the backfill for one and one-half years to 98 percent density without complaining that it was excessive. Also, in a letter from the subcontractor to plaintiff, the subcontractor stated "our exterior backfill according to plans and specification must be compacted to 98% density." Although the 98% density requirement may have been considered unusual, the subcontractor's letter coupled with its compliance to 98% density for a year and one-half clearly evidences that plaintiff and his subcontractor interpreted the compaction of backfill to be 98% density prior to the controversy. *See Astro-Space Laboratories, Inc. v. United States*, 200 Ct.Cl. 282, 295, 470 F.2d 1003, 1010 (1972) (contractor's hindsight interpretation was not appropriate when there was no "convincing evidence to show that plaintiff actually relied on the construction it now urges in its performance of the contract"). Thus, plaintiff was bound by the 98% interpretation. *See S.S. Silberblatt, Inc. v. United States*, 193 Ct.Cl. 269, 278, 433 F.2d 1314, 1318 (1970) ("In the absence of compelling indications to the contrary, not present here, the construction that the parties have themselves placed on a contractual provision *ante litem motam* should not be disturbed when, at a later date, the meaning of the provision is called into question by one of them."). Plaintiff's claim is without merit.

### 7. *Incompatible Tolerances for the Concrete Walls and Granite Facade*

Plaintiff seeks an equitable adjustment based on alleged incompatibilities between the specifications and drawings on the tolerances permitted in the contract between the granite facade and the concrete walls. The concrete walls were 30 to 40 feet high and about 95 percent thereof was below grade. Granite was placed only along the above grade section of the wall.

■ It is a well settled principle of law that the government warrants the sufficiency of its specifications. *Southwest Welding & Mfg. Co. v. United States*, 188 Ct.Cl. 925, 413 F.2d 1167 (1969); *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). Therefore, if the contractor is put to additional expense as a result of defective or impossible government specifications, it is entitled to an equitable adjustment. However, if the discrepancy is obvious, the contractor is obligated to bring the situation to the government's attention if it intends to subsequently resolve the issue in its favor. *E.g., Space Corp. v. United States*, 200 Ct.Cl. 1, 5, 470 F.2d 536, 538 (1972). While ambiguous contracts are generally construed against the author, the contractor must nevertheless inquire about an obvious discrepancy, omission, or conflict. *E.g., George Hyman Constr. Co. v. United States*, 215 Ct.Cl. 70, 80–81, 564 F.2d 939, 945 (1977).

In the present case, the contract drawings showed a space between the concrete walls and the masonry, to provide room for the setting of the stone and the required relieving angles, flacking, membrane waterproofing, and dry pack. The depiction of shims on the drawings makes it clear that the contractor had to hold back its concrete forms and shim out between relieving angles. The usual practice in the trade would have been simply to have taken minus tolerances in order to provide adequate space for the items prescribed in the specifications and the drawings. Any possible tightness of space between the concrete and the stone could have been observed at a glance. Therefore, examined as a whole, the contract shows no incompatibility between the drawings and specifications on the tolerances between the gran-

ite facade and concrete wall. *See George Hyman Constr. Co.*, 215 Ct.Cl. at 79, 564 F.2d at 944 (1977) (a drawing requiring contractor to "stub out" utility lines five feet from building was complementary to another drawing requiring plaintiff to connect the lines to existing lines, notwithstanding plaintiff's claims that trade practice only required extending the lines out five feet).

■ Assuming *arguendo* that there was an incompatibility, this court finds that it would have been a patent, not latent, ambiguity for which plaintiff should have sought clarification. *See, e.g., WPC Enterprises v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). A reasonable person with the same qualifications as plaintiff would have interpreted the discrepancies between the contract drawings and the specifications to be obvious and would have had the responsibility to inquire about the discrepancy if it intended to rely upon its interpretation in the future. *See, e.g., Merando, Inc. v. United States*, 201 Ct.Cl. 19, 21, 475 F.2d 598, 599 (1973). Plaintiff did not voice any complaint until the granite facade was in place and it had to chip and cut the stone in order to meet the contract requirements. Any increase in cost or time was a result of plaintiff's own fault. Thus, plaintiff is not entitled to an equitable adjustment on the alleged incompatibility of the tolerances between the granite facade and concrete wall.

8. *Misinspection of Granite for the Fountains*

■ Each of the underground garages required construction of a ˙ fountain and pool with a circular wall around it. The exterior wall consisted of wedge-shaped granite blocks that were to fit together around a concrete ring. However, when the granite blocks arrived at the site, they did not fit together properly. The granite blocks were fabricated from templates that the stone fabricator supplier prepared from the dimensions shown on the drawings. When the blocks were cut they were inspected against the templates, but not the shop drawings. As a result of the improp-

er fitting, the diameter of the wall had to be decreased by cutting and chipping the granite. Plaintiff alleges that it is entitled to equitable adjustment for increased time and costs incurred as a result of improper inspection by defendant because its inspector examined and approved the granite for the fountains at the source.

In *S.S. Silberblatt, Inc.*, 193 Ct.Cl. 269, 433 F.2d 1314 (1970), the court discussed two cases where interpretation of similar contract language led to the conclusion that the government had the "right to ultimately reject certain fabricated materials even though it had inspected and approved them at the point of fabrication." *Id.* at 276, 433 F.2d at 1317. The contract in the present case states that "[n]o inspection or other action of the Government shall constitute ... a final acceptance ... until all work under the contract is completed." Article 2–49. As a matter of law and contract interpretation, the court determines that inspection of the granite at the plant did not relieve plaintiff of its fundamental obligation to deliver goods that complied with the contract specifications. *See id.*

The court has also considered the standard trade practice in the specific field to ascertain the responsibilities of the parties. *See Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971) ("the language of a contract must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances"). Expert testimony in this case showed that plaintiff's fabricator is responsible for the template and shop drawings to be in agreement, and that the government is only responsible to see that the cuts match the templates. There was no testimony or other evidence to rebut this standard trade practice. Moreover, it is reasonable to conclude that this is a fair trade usage and that other reasonable construction persons would agree with this interpretation because of the time element that would be involved if the government were to inspect the cuts to the templates and the templates to the shop drawings. Thus, defendant is not liable for any miscalculation between the template and shop drawings

because plaintiff is responsible for any corrective work necessitated by its suppliers' improper shaping of the granite at its plant.

## C. *Suspension of Work and Unreasonable Delays*

The contract included the following Suspension of Work clause (Specification 2–19):

> No extra compensation will be allowed the Contractor in case of suspension of the work, unless the work is suspended by written order of the Government and the Architect finds that such suspension of work causes necessary expenditures by the Contractor which would not have otherwise been required. In such case, an equitable adjustment will be made in the contract price and time.

Plaintiff alleges that under the Suspension of Work clause, it is entitled to equitable adjustment for both time and cost as a result of the defendant's delays in releasing the worksite and approving the anchors and bracing. In *Commerce International Co. v. United States*, 167 Ct.Cl. 529, 338 F.2d 81 (1964), the court stated that "[a]bsent a warranty ... the contractor's recourse for mere delay is to seek an extension of time of his performance." *Id.* at 535–36, 338 F.2d at 85. However, this remedy is based upon the assumption that the Government "has met the ever-present obligation of any contracting party to carry out its bargain reasonably and in good faith," and "[u]nless expressly negatived, that duty is read into all bargains." *Id.*

### 1. *Release of the Work Site*

■ Plaintiff requested at the pre-construction meeting to have the site available to begin work by October 12, 1964. However, defendant indicated that it wished to defer making the site totally available for demolition until October 19th. Plaintiff agreed to that plan. Although defendant allowed a 12–day extension for the delay in providing a free and clear work site, plaintiff maintains that it is also entitled to additional compensation because the delay was unreasonable. Even though plaintiff may not have been provided a completely free and clear work site on October 12th,

plaintiff had sufficient access to commence work on a fence surrounding the work site, which was required by the contract to be erected prior to the start of demolition. The court finds no unreasonable delay or additional costs incurred in suspending demolition to October 19th since the fence was not completed until the day after plaintiff was permitted to start demolition. In addition to erecting the fence around the site, plaintiff performed the following work from October 12th to October 19th: (1) located utility lines, (2) performed survey work, (3) set up trailers, (4) cleared the work site, (preparatory to demolishing the work site) and (5) prepared shop drawings. Under these circumstances, the court can find no basis to award additional compensation to plaintiff. No necessary expenditures which would not have been otherwise encountered were proved by plaintiff.

### 2. *Delays in Approving Drawings of Anchors and Bracing for Plaintiff's Alternative Excavation Bracing System*

Plaintiff alleged that response to critical submissions relating to its alternative excavation bracing system, including shop drawings for anchors and bracing, exceeded the agreed-upon 10–day standard and were thus unreasonable. The court must decide whether (a) the delay was warranted, and (b) if so, should additional compensation be awarded. Whether the response was in the form of an approval or denial, the court holds that plaintiff was entitled to a response on drawing submissions within ten days because defendant expressly advised plaintiff at the pre-construction conference that 10 days would be a reasonable time to process submissions. *See Myers-Laine Corp.*, ASBCA No. 18234, 74–1 BCA ¶ 10,467 at 49,460 (1974) (determining that 15 days was a reasonable time for approval of shop drawings and allowing time extensions for government delays beyond 15 days).

■ With respect to additional compensation, the court considers plaintiff's delays and problems associated with the design of anchors and bracing to not be a breach of defendant's duty to "carry out its bargain

reasonably and in good faith" because defendant did not act unreasonably on submissions and defendant made a good faith effort to assist plaintiff, including special meetings and suggestions on how to resolve the alternative excavation design problems. *See Commerce,* 167 Ct.Cl. at 535–36, 338 F.2d at 85. In fact, some of plaintiff's drawings had faulty design computations, resulting in lost time from corrections and resubmissions. Thus, plaintiff is entitled to time extensions for delays beginning ten days after submission until defendant first responded, even if defendant's response was for additional information or notice that the submissions could not be responded to because they were faulty, incomplete, etc. No additional compensation is allowed.

### D. *Contract Breaches*

The Court of Claims also directed this court to "hold whatever trial may be necessary" on the breach of contract claims since the Board did not hear those claims. *Baltimore Contractors, Inc. v. United States,* 210 Ct.Cl. 678, 226 Ct.Cl. 394, 405, 643 F.2d 729, 735 (1981). However, the appellate court added, "To the extent that evidence was properly admitted before the Board that bears on the breach claim, the trial judge need not duplicate the Board proceedings, but should incorporate that evidence as part of the record before him." *Id.* The court finds adequate information in the record to rule on all the breach of contract claims.

### 1. *Failure to Disclose Soil Data and Arbitrary Selection of Proctor Curves*

 Plaintiff argues that equitable adjustments under the changed conditions' and constructive changes' clauses are not coextensive remedies with the damages allowable for breach of contract. Although direct and indirect costs are allowable for defendant's failure to disclose soil data and defendant's arbitrary selection of proctor curves, a long established rule prevents allowance for profit on increased costs. *Laburnum Constr. Corp. v. United States,* 163 Ct.Cl. 339, 352–53, 325 F.2d 451, 459 (1963). Thus, even though plain-

tiff is entitled to compensation for damages resulting from the changed condition claim that incorrect borings were depicted on the contract documents, plaintiff may not obtain profits on those costs. Similarly, plaintiff is entitled to compensation on the constructive change for arbitrary selection of proctor curves, but no profits are allowable. The court considers the remedies for these breach of contract claims to be coextensive with the remedies for plaintiff's changed condition and constructive change claims because only damages actually sustained are recoverable in this situation, even if the court were to find a breach of contract. *See, e.g., Consolidated Diesel Electric Co. v. United States,* 209 Ct.Cl. 521, 558 n. 12, 533 F.2d 556, 576 n. 12 (1976) (noting that "[a] party cannot maintain a separate breach of contract action which seeks no relief further or different from that which was available to it under the contract"). Even if this court were to find a breach of contract through misrepresentation, "only damages actually sustained" would be recoverable. *Potashnick v. United States,* 123 Ct.Cl. 197, 219, 105 F.Supp. 837, 839 (1952).

### 2. *Failure to Disclose the Tolerance Incompatibilities*

 Although a claim for breach of contract through misrepresentation may survive and exist independent of a constructive change claim, *see id.,* the court has already determined that there was no incompatibility between the drawings and specifications on the tolerances for the granite facade and concrete wall. The record is replete with testimony that the drawings indicated that space must be maintained between the concrete and masonry for the installing of relieving angles, flacking, waterproofing, and dry pack. The depiction of shims on the drawings make it clear that the contractor had to hold back its concrete forms and shim out between relieving angles. Moreover, there is nothing in the record to suggest that defendant deliberately misled or withheld information from plaintiff on this claim. Thus, there was no breach of contract for

failure to disclose an incompatibility of tolerances.

### 3. *Failure to Provide an Adequate Remedy Under the Disputes Clause*

 Plaintiff summarily argues that the trial court has already determined that the Government had a contractual duty to provide an adequate administrative remedy under the contract disputes clause and that this duty was breached. Indeed, the court notes that even the appellate court agreed and held that "the Board proceedings in this case were so defective that the Board's findings and decision are not entitled to the usual finality accorded Board decisions under the Wunderlich Act, 41 U.S.C. §§ 321–22." *Baltimore Contractors, Inc. v. United States*, 210 Ct.Cl. 678, 226 Ct.Cl. 394, 395, 643 F.2d 729, 729 (1981).[13] Thus, the court is of the opinion that the defective administrative remedy issue has already been heard and allowed by the Court of Claims as witnessed by the fact of this unusual proceeding. In other words, the court believes that its *de novo* review of the record before the HOBC was intended to be the only relief available to plaintiff as a result of the defective administrative remedy. Under these unique procedural circumstances, plaintiff's repeated claim for failure to provide an adequate administrative remedy is moot.

### CONCLUSION

In reaching its conclusion, the court conducted a thorough *de novo* review of the voluminous record and considered all of the issues and arguments raised by the parties. The court made a number of findings to support its conclusion but did not feel it necessary, nor particularly desirable, to address each and every argument presented. All arguments were considered by the court but some were found not to be particularly relevant to, or dispositive of, the claim at hand and were, therefore, not specifically addressed.

13. Although the trial court found that the administrative remedy was defective and determined that a *de novo* trial was required, the

Based upon its *de novo* analysis of the administrative record before the HOBC, the court finds that plaintiff is entitled to certain equitable adjustments to the contract because of changes, changed conditions, and delay caused by defendant as discussed herein. Given this court's opinion on liability, the case is now ripe for settlement of the quantum. The court exhorts the parties to bring this protracted litigation to an end and will be available to assist in any way that it can. Defendant shall advise the court of the status of the parties' progress toward a quantum stipulation every 60 days from the date of this Opinion.

appellate court remanded the case for a *de novo* review of the record developed by the HOBC.